UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ALAN N. KNOWLTON,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        CV-09-334-B-W
                                     )
JUDITH SHAW, et al.                  )
                                     )
            Defendant.               )

**ORDER ON MOTIONS TO DISMISS**

Concluding that because the entire employment contract is an extrinsic document and not before the Court, the Court declines to grant a motion to dismiss the bulk of Alan D. Knowlton's employment-based causes of action against his former employer Bankers Life and Casualty Company (Bankers Life) and its employees.  Because Mr. Knowlton's slander *per se* claims are barred by the applicable statute of limitations, the Court grants the Bankers Life employees' motion to dismiss the slander counts to the extent they are premised on allegedly slanderous statements made outside the two-year statute of limitations period; however, to the extent the slander *per se* claims are based on allegedly slanderous statements made or repeated within the statute of limitations, the motion to dismiss is denied.  The Court grants the motion to dismiss of three state employees because the Court determines that in negotiating and entering into Consent Agreements on behalf of a state of Maine agency for the imposition of civil penalties, they are entitled to absolute immunity.  Finally, the Court grants a motion to dismiss by all Defendants of a claim under 42 U.S.C. § 1985(2), because Mr. Knowlton has failed to allege conspiratorial acts directed at federal judicial proceedings or to allege that he was the victim of class-based, invidiously discriminatory animus.

# I.        STATEMENT OF FACTS

## A.        Procedural History

On July 1, 2009, Alan D. Knowlton filed a civil complaint in Penobscot County Superior Court against Judith Shaw, Andrew Black and Glenn Griswold, claiming that while employed by the state of Maine, they violated his civil rights and interfered with an advantageous business relationship by requiring his former employer Bankers Life to terminate his employment. *Compl.* Attach. 1 (Docket # 1).   On July 28, 2009, Glenn Griswold removed the case to this Court.   *Notice of Removal* (Docket # 1).  On October 14, 2009, Mr. Knowlton moved to amend his Complaint to add as defendants Bankers Life and Casualty Co. and a number of Bankers Life employees (Bankers Life Defendants).[1]  *First Mot. to Amend the Pl.'s Compl.* (Docket # 10); *Am. Compl.* (Docket # 11).    On November 5, 2009, the Court granted the motion.   *Order* (Docket # 13).  On December 14, 2009, Bankers Life and its employees moved to dismiss the Amended Complaint and on January 5, 2010, Judith Shaw, Andrew Black and Glenn Griswold (State Defendants) followed suit.  *Defs. Bankers Life and Casualty Co., Michael Buckley, Bruce Jordan, and James Valdez's Mot. to Dismiss Under Rule 12(b)(6)* (Docket # 23) (*Bankers' Mot.*); *Mot. to Dismiss of Defs. Judith Shaw, Andrew Black and Glenn Griswold* (Docket # 29) (*State Defs.' Mot.*).   Mr. Knowlton responded to the Bankers Life Defendants' motion on January 4, 2010 and to the State Defendants' motion on February 5, 2010.  *Pl.s' Resp. to the Defs. Bankers Life's Mot. to Dismiss* (Docket # 28) (*Pl.'s Resp. to Bankers' Mot.*); *Pls.' Resp. to Mot. to Dismiss of Judith Shaw, Andrew Black, and Glenn Griswold* (Docket # 40) (*Pl.'s Resp. to State Defs.' Mot.*).   Bankers Life replied on January 15, 2010 and the State Defendants replied

---

[1] The Amended Complaint added Mila Kofman in her official capacity as Superintendent of the Maine Bureau of Insurance, Janet Mills in her official capacity as Maine Attorney General.  *Am. Compl.* ¶¶ 5,6.  On February 17, 2010, Mr. Knowlton moved to dismiss both Superintendent Kofman and Attorney General Mills.  *Mot. to Dismiss* (Docket # 43).  The Court granted the motion on February 19, 2010.  *Order* (Docket # 45).

on February 16, 2010. *Defs. Bankers Life and Casualty Co., Michael Buckley, Bruce Jordan, and James Valdez's Reply to Pl.'s Resp.* (Docket # 31) (*Bankers' Reply*); *Reply Mem. in Support of Defs. Judith Shaw, Andrew Black and Glenn Griswold's Mot. to Dismiss Counts I, II, IV, VI, VII, IX and XI of Pl.'s Am. Compl.* (Docket # 42) (*State Def.'s Reply*).

### B.     The Allegations

In the Amended Complaint, Mr. Knowlton says that in November 1980, Bankers Life hired him as a sales agent in the Concord, New Hampshire office, and in May 1985, he was promoted to Branch Sales Manager for the Bangor, Maine Bankers Life office. *Am. Compl.* ¶¶ 14, 15. As Branch Sales Manager, Mr. Knowlton was responsible for building and growing the Bangor office by recruiting, training, and developing career agents, sales managers, and administrative staff and for overseeing their work. *Id.* ¶ 16. During the twenty year period he was Branch Sales Manager, the Bangor office grew from three to twenty-five to thirty agents and from an office that ranked 219th out of 225 Bankers Life branch offices to one that ranked among its top 50. *Id.* ¶ 17. Mr. Knowlton alleges that during his twenty year tenure, he was repeatedly told by senior Bankers Life managers that the Bangor office was "your office," that it was an opportunity "to build your own business," that it represented an "entrepreneurial opportunity for you," and to "run your office as you see fit." *Id.* ¶ 18. During this period, Mr. Knowlton earned numerous awards for the Bangor office's performance and the quality of the business the office produced. *Id.* ¶ 20. Mr. Knowlton claims that the retirement and other employee benefit programs were designed to encourage branch managers to remain with Bankers Life until they retired and that it "had a policy, either formal or informal or both to only terminate Branch Sales Managers on a lack of performance or proven wrongdoing." *Id.* ¶¶ 21-25. He alleges that his

"reasonable expectation of continued employment as Branch Sales Manager of Bankers Life created a constitutionally protected property interest in his job." *Id.* ¶ 28.

On April 5, 2005, Bankers Life and the Maine Bureau of Insurance (Bureau) entered into a Consent Agreement, which provided among other things that the Bureau and the Office of the Attorney General for the state of Maine "agree to forgo pursuing further disciplinary measures or other civil or administrative sanctions against Mr. Knowlton for violations described in the Stipulations, other than those agreed in this Consent Agreement." *Id.* ¶ 31.  On April 11, 2005, however, Bankers Life and the Bureau entered into a separate Consent Agreement for offenses arising out of the operation of Bankers Life's South Portland office, and as part of that agreement, a clause was inserted at the request of Bankers Life and with the acquiescence of the Attorney General that required Bankers Life to terminate Alan Knowlton as the Branch Sales Manager of the Bangor Branch Office.  *Id.* ¶ 34.  The April 11, 2005 Consent Agreement provides that "Nothing in this agreement shall affect the rights, interests, duties or obligations of any person who is not a party to this agreement." *Id.* ¶ 35.  Despite this clause, despite the fact Mr. Knowlton was not given notice of the complaints that motivated the Attorney General's actions, and despite the fact he had a constitutionally protected interest in his employment, Bankers Life acting pursuant to the Consent Agreement terminated Mr. Knowlton's employment, causing him extreme financial hardship and emotional distress.  *Id.* ¶¶ 36-45.

Mr. Knowlton's Amended Complaint contains Twenty Three Counts.  Counts I through X allege violations of Mr. Knowlton's civil rights under 42 U.S.C. § 1983; Count I - all Defendants; Count II - Ms. Shaw, Count III - the Bureau, Count IV - Andrew Black, Count V - the Maine Attorney General; Count VI - Ms. Shaw, Mr. Griswold, and Mr. Black; Count VII - Ms. Shaw; Count VIII – the Bureau; Count IX – Mr. Black; and, Count X – the Maine Attorney

4

General.  Count XI alleges that Ms. Shaw, Mr. Black, Mr. Griswold, and Mr. Valdez engaged in a conspiracy with the Bureau and Bankers Life to violate Mr. Knowlton's civil rights under 42 U.S.C. § 1985(2).  Counts XII, XIII, XIV, XVI, XVII, XIX, and XX allege negligent and intentional misrepresentation claims against Bankers Life, Mr. Valdez, Mr. Buckley, and Mr. Jordan; Counts XV and XVIII allege slander *per se* claims against Mr. Valdez and Mr. Buckley. Counts XXI, XXII and XXIII allege breach of contract, breach of implied contract, and promissory estoppel claims against Bankers Life.  Mr. Knowlton seeks compensatory and punitive damages.

## II.    DISCUSSION

### A.    Legal Standard

In ruling on a motion to dismiss, a court is required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).  To survive a motion to dismiss, a plaintiff must allege "sufficient facts to show that he has a plausible entitlement to relief." *Id.* (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

### B.    The Bankers Life Motion to Dismiss

The December 14, 2009 motion to dismiss was filed on behalf of Bankers Life, and its employees Michael Buckley, Bruce Jordan, and James Valdez.  The Counts that state claims against these Defendants are:  1) Count I – the § 1983 claim; 2) Count XI – the § 1985(2) claim, 3) Counts XII XIII, XIV, XVI, XVII, XIX and XX – the negligent and intentional misrepresentation claims; 4) Counts XV and XVIII – the slander per se claims; and, 5) Counts XXI, XXII and XXIII – the breach of contract, breach of implied contract, and promissory

estoppel claims.  The merits of the motions to dismiss all, except the slander *per se* claims, depend to some extent on the terms of the agreement between Mr. Knowlton and Bankers Life; however, the parties do not agree on the most basic fact:  the terms of his Bankers Life employment contract.  The Court turns first to whether, in ruling on the motion to dismiss, it can consider the Bankers Life employment contracts.

### 1.    Extrinsic Documents and a Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), "[o]rdinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  *Alternative Energy*, 267 F.3d at 33.  The First Circuit recognizes a "narrow exception":  "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to the plaintiffs' claim; or for documents sufficiently referred to in the complaint."  *Id.* (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1998)).  The *Alternative Energy* Court explained that when the complaint "relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss."  *Id.* (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998)).

Here, although the terms of Mr. Knowlton's employment relationship with Bankers Life are central to his grievance, the Amended Complaint fails to mention a written employment contract.  *Am. Compl.* Even in his breach of contract count, Mr. Knowlton only generally alleges that Bankers Life contracted with him and breached its contract by constructively discharging him.  *Id.* ¶¶ 238, 240.  In their motion to dismiss, the Bankers Life Defendants attached two exhibits:  Exhibit A – a Branch Sales Manager Contract and Exhibit B – a Unit Sales Manager Contract.  *Bankers' Mot.* Attach. 1, 2.  The Branch Sales Manager Contract between Bankers

6

Life and the "Manager named in the Declarations page" contains a page of Declarations, which has a signature for Alan D. Knowlton dated December 20, 1994, *id.* Attach. 1 at 2, 9; the Unit Sales Manager Contract between Bankers Life and the "Unit Sales Manager named in the Declarations Page" contains a Declaration Page, which says it was digitally signed by Alan D. Knowlton on January 11, 2006. *Id.* Attach. 2 at 2, 9.

In his Response, Mr. Knowlton objects to consideration of the two employment contracts. If a Rule 12(b)(6) motion requires consideration of matters outside the pleadings, the motion "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Mr. Knowlton contends that if the Court considers the two employment contracts, the motion should be converted to a motion for summary judgment and the parties should be given an opportunity to present all the material that is pertinent to the motion. *Pl.'s Resp. to Bankers' Mot.* at 7. Mr. Knowlton contends that the attached contracts are incomplete, because they expressly incorporate "all policies, practices and procedures adopted by the company" and no documents containing those "policies, practices and procedures" were attached.[2] *Id.* In effect, Mr. Knowlton questions the completeness of the attached employment contracts.

*Alternative Energy*'s "narrow exception" is premised on the notion that if the parties do not dispute a central document, a court may consider it in ruling on a motion to dismiss; yet, if there is a genuine dispute, the legal sufficiency of the cause of action is better tested in a motion for summary judgment. *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (stating that "if matters outside the pleadings are considered, the motion must be decided

---

[2] Mr. Knowlton also objected to consideration of the employment contracts because they were not properly authenticated, since they were simply attached to the Bankers Life Defendants' motion without an authenticating affidavit. *Pl.'s Resp. to Bankers' Mot.* at 9-10. In its Reply, Bankers Life responded to the authenticity question by filing an affidavit from a Bankers Life manager, verifying that the employment contracts attached to the Bankers Life Defendants' motion to dismiss are true and correct copies of the contracts between Bankers Life and Mr. Knowlton. *Bankers Life Reply* Attach. 1 at 1-2.

under the more stringent standards applicable to a Rule 56 motion") (citation omitted). Typically, a contract between the parties is the type of document the courts have considered when ruling on a motion to dismiss.  *Id.* at 15-16 (upholding consideration in a motion to dismiss of a forum selection clause in a contract the authenticity of which was not challenged); 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1364 (3d ed. 2004) (stating that "[i]llustrative of the type of supporting and opposing materials that have been used on various Rule 12(b) motions are the following:  a variety of . . . contracts").  Nevertheless, when the responding party challenges not the authenticity of an employment contract, but its completeness, a court is not in a position in a motion to dismiss to evaluate whether what is missing would generate a genuine issue of material fact.  Here, the Court has considerable doubts about whether Bankers Life's "policies, practices and procedures" would make a difference as to whether the Bankers Life Defendants will ultimately be successful in their attack against the legal sufficiency of Mr. Knowlton's causes of action; however, if the Court ruled in favor of Bankers Life, it would invite a procedural challenge to the ruling that will be obviated in a motion for summary judgment.  Accordingly, the wiser course is to defer consideration of a summary disposition until the parties have placed before the Court a complete set of employment contracts.

Once the employment contract is excluded from consideration, this leaves the question of whether the Bankers Life Defendants have raised a legal basis for dismissal of any of the counts not dependent upon the terms of the employment agreement.  Although it could be argued that the viability of a number of the counts does not rely on the precise terms of the employment agreement, the Court has focused on the statute of limitations issue on the slander *per se* counts

as clearly not dependent on the contract terms.  The sufficiency of the remaining counts is, in the Court's view, better tested by a motion for summary judgment.

### 2.    Slander *Per Se* and the Statute of Limitations

Alan Knowlton's Amended Complaint contains two slander *per se* counts, which allege that James Valdez and Michael Buckley made slanderous statements that injured Mr. Knowlton in his occupation or business:   Count XV against James Valdez and Count XVIII against Michael Buckley.  Count XV says that on June 27, 2006, Mr. Valdez told Lucy Karl, Counsel:

> Quite to the contrary, the investigation by the investigation (sic) by the Maine Bureau of Insurance led the Bureau to conclude that Mr. Knowlton was not competent to manage the Bangor office, nor remain in any management capacity in any Maine branch operated by Bankers Life and Casualty Company.

*Am. Compl.* ¶ 183.  Mr. Knowlton alleges that Mr. Valdez made this statement to "other third parties."  *Id.* ¶ 184.  He says the statement "disparaged Alan Knowlton's character by suggesting that he was incompetent and dishonest in his business dealings" and that as a direct result, he suffered economic loss and severe and debilitating emotional distress.  *Id.* ¶¶ 185, 187.  Count XVIII alleges that on July 7, 2006, Mr. Buckley told Gerald Glynn:

> That the State of Maine had determined that Alan Knowlton could not be a Branch Sales Manager in Maine because of Alan Knowlton's improper/dishonest sales practices.
>
> And
>
> That the State of Maine had determined that Alan Knowlton could not be a Branch Sales Manager in any other state because of Alan Knowlton's improper/dishonest sales practices.

*Id.* ¶¶ 212-213.  Mr. Knowlton claims that Mr. Buckley repeated the statement to "other third parties."  *Id.* ¶ 214.  He says that these statements "disparaged Alan Knowlton's character by suggesting that he was incompetent and dishonest in his business dealings" and that as a direct result, he suffered economic loss and severe and debilitating emotional distress.  *Id.* ¶¶ 215, 217.

The Bankers Life Defendants assert that these slander *per se* claims are barred by Maine's statute of limitations. *Bankers' Mot.* at 10. Under 14 M.R.S.A. § 753, Maine law provides:

> Actions for assault and battery, and for false imprisonment, slander and libel shall be commenced within 2 years after the cause of action accrues.

The Amended Complaint alleges a June 27, 2006 statement by Mr. Valdez and a July 7, 2006 statement by Mr. Buckley. Mr. Knowlton filed the Complaint in Penobscot County Superior Court on July 2, 2009 well beyond the two year statute of limitations. *Notice of Removal* Attach. 3 at 1. In his Response, Mr. Knowlton conceded that the "Bankers Life Defendants are absolutely correct, there is a nominal two year statute of limitations on any slander claim." *Pl.'s Resp. to Bankers' Mot.* at 16. However, relying on the continuing tort doctrine, he claims that slander is a continuing tort and thereby escapes the two-year limit. *Id.* He alleges that the fact the statements "were subsequently repeated by the Bankers Life Defendants" and the fact that the Consent Agreement "has not been recanted" amount to "a continuing recitation that Mr. Knowlton is incompetent and dishonest." *Id.* at 17.

As explained by the Maine Supreme Judicial Court, the continuing tort doctrine may be applied when no single incident in a chain of tortious conduct can "fairly or realistically be identified as the cause of significant harm." *McLaughlin v. Superintending Sch. Comm.*, 2003 ME 114, ¶ 23, n.6, 832 A.2d 782, 789 (quoting *Fowkes v. Penn. R.R. Co.*, 264 F.2d 397, 399 (3d Cir. 1959)); *Frontier Commc'ns Corp. v. Barrett Paving Materials, Inc.*, 631 F. Supp. 2d 110, 115 (D. Me. 2009). Thus, in *Fowkes*, a man who had been assigned to operate an air hammer, which periodically jolted, suffered a continuing tort, since no one jolt could be blamed for his arthritic condition. *Fowkes*, 264 F.2d at 399. Bankers Life rejoined that "[c]ourts almost universally decline to apply the [continuing tort] doctrine in defamation cases." *Bankers' Reply*

10

at 7 (quoting *Murphy v. Maine*, CV-06-62-B-W, 2006 U.S. Dist. LEXIS 61638, at *18 (D. Me. Aug. 29, 2006)).

Bankers Life is correct.  "Courts almost universally decline to apply the doctrine [of continuing tort] in defamation cases."  *Murphy*, 2006 U.S. Dist. LEXIS 61638, at *18 and cases cited therein.  To the extent that Mr. Knowlton is alleging that the June and July 2006 statements constituted isolated incidents of slander *per se*, he has not alleged a continuing tort and Maine's two-year statute of limitations bars both claims.

Mr. Knowlton cites no legal authority for his blanket assertion that the failure to recant extends a defamation statute of limitations, and the Court is aware of no case supporting his contention.  The Court is dubious about whether Mr. Knowlton correctly states the law.  As a practical matter, defamations are not typically followed by recantations, and Mr. Knowlton's unsupported assertion would effectively extend indefinitely the two year defamation statute of limitations, a result that runs contrary to the general refusal of the courts to treat defamation as a continuing tort.  Finally, it would be highly unusual for the failure to undertake an affirmative act to extend the running of a statute of limitations.  The Court concludes that to the extent Mr. Knowlton is contending that the statute of limitations has not run on the July and June 2006 statements because neither Mr. Valdez nor Mr. Buckley has recanted their alleged statements, the Court rejects his assertion as unsupported and incorrect.

However, Mr. Knowlton has one argument that avoids dismissal of Counts XV and XVIII.  In his Amended Complaint, Mr. Knowlton alleged that both Mr. Valdez and Mr. Buckley repeated these statements to "other third persons," but did not allege when these statements took place.  *Am. Compl.* ¶¶ 184, 214.  If, as Mr. Knowlton alleges, these Defendants repeated these statements to third persons within two years before July 2, 2009, the allegations in both counts

would survive a motion to dismiss on statute of limitations grounds.  *Murphy*, 2009 U.S. Dist. LEXIS 61638, at *18-19 (stating that "[r]epeated defamations do not constitute a continuing tort; rather, as courts have uniformly recognized, each separate defamatory statement itself constitutes a separate and distinct cause of action") (citation omitted).

In view of Mr. Knowlton's allegation that each Defendant repeated these statements to third persons, the Court denies the Bankers Trust Defendants' motion to dismiss Counts XV and XVIII and will allow Mr. Knowlton to explore in discovery whether these asserted repetitions took place and, if so, whether they took place within the two-year period before July 2, 2009. Absent evidence that they repeated these statements within two years of July 2, 2009, Mr. Valdez and Mr. Buckley will be entitled to a summary disposition of these counts.

### C.      The State Defendants' Motion to Dismiss

The State Defendants moved separately to dismiss all counts against the three remaining state employee defendants.  *State Defs.' Mot.*  They contend that they are immune from liability under 42 U.S.C. § 1983 for their respective roles in a state administrative enforcement action, that if they are not immune, Bankers Life's decision to remove Mr. Knowlton does not fulfill the requirement of state action and does not implicate a property interest that is cognizable under the Due Process Clause, that the Contracts Clause claim fails because Mr. Knowlton has not alleged a foundational legislative act at issue, and to the extent he has, the Contracts Clause is directed solely to acts of the Legislature and there is no allegation of an express contract, that the conspiracy to violate civil rights under 42 U.S.C. § 1985(2) fails to state a claim, and Mr. Knowlton has failed to allege either invidious discrimination or an equal protection claim.  *Id.* at 4-16.

1.        **State Defendant Immunity**

The State Defendants argue that they are entitled to absolute immunity from civil liability for their "actions in negotiating and executing a Consent Agreement with Bankers Life" since their actions "were taken in their official roles with the [Bureau] or the Attorney General's office and as part of an administrative enforcement action to end predatory business practices against elderly Maine citizens by that company's employees."[3] *State Defs.' Mot.* at 4.  In his Response, Mr. Knowlton concedes that the law provides absolute immunity for "matters directly related to the judicial process," but relying on *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), he contends that absolute immunity does not extend to "administrative or investigative actions."[4]  *Pl.'s Resp. to Defs.' Mot.* at 11, 12.

Immunity is "defined by the functions it protects and serves." *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (citation omitted).  "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991).  There is a "presumption . . . that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486-87.  Prosecutors are absolutely immune from suit for monetary damages under § 1983 for conduct that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).  "[A]gency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity

---

[3] A preliminary question is whether prosecutorial immunity extends to individuals within a state agency who are performing prosecutorial functions.  In his Response, Mr. Knowlton concedes this point.  *Pl.'s Resp. to State Defs.' Mot.* at 12 (stating that the Plaintiff "recognizes that *Butz v. Economou*, 438 U.S. 478 (1978) extended the reach of absolute immunity to individuals performing prosecutorial functions within an agency").

[4] The fact that the State Defendants were not acting as criminal prosecutors but were enforcing a civil violation does not exclude them from the absolute immunity defense.  *Mendenhall v. Goldsmith*, 59 F.3d 685, 691 (7th Cir. 1995) (stating "that the alleged misconduct here arose in the context of a civil proceeding with a law enforcement purpose does not render absolute immunity inappropriate") (footnote omitted); *Schrob v. Catterson*, 948 F.2d 1402, 1411 (3d Cir. 1991) (extending absolute immunity to a prosecutor's initiation of an *in rem* civil proceeding); *Hoffman v. Connecticut*, No. 09-CV-79-B-H, 2009 U.S. Dist. LEXIS 92340, at *24 (D. Me. Aug. 7, 2009).

with respect to such acts." *Butz*, 438 U.S. at 515.  For example, a government agent's "decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution.  An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought." *Id.*

In *Buckley*, following *Imbler*, the Supreme Court reiterated the view that absolute immunity does not extend to all actions by a prosecutor.  The *Buckley* Court refused to accord absolute immunity to "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Buckley*, 509 U.S. at 273.  The Court further observed that it "did not attempt to describe the line between a prosecutor's acts in preparing for those functions, some of which would be absolutely immune, and his acts of investigation or 'administration,' which would not." *Id.* at 270.

The case law provides some examples of conduct that is absolutely immune and conduct that is not.  In *Burns*, the Supreme Court concluded that prosecutors are not entitled to absolute immunity for the advice they give the police, but they are entitled to absolute immunity for participating in a probable cause hearing.  500 U.S. at 489-90.  In *Buckley* itself, the Supreme Court rejected the plaintiff's argument that absolute immunity extended "only to the act of initiation itself and to conduct occurring in the courtroom." *Buckley*, 509 U.S. at 272.  It restated *Imbler*'s conclusion that absolute immunity includes "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.* (quoting *Imbler*, 424 U.S. at 431, n.33).  The *Buckley* Court distinguished between actions a prosecutor takes as an advocate, ranging from evaluating evidence for prosecution to the prosecution itself, and actions a prosecutor takes

as an investigator, "searching for the clues and corroboration" and planning and executing "a raid on a suspected weapons cache." *Id.* at 273.   In *Guzman-Rivera v. Rivera-Cruz*, the First Circuit explained that the "prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches."  55 F.3d 26, 29 (1st Cir. 1995).  The First Circuit quoted *Burns* as stating:   "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." *Id.* at 29-30 (quoting *Burns*, 500 U.S. at 495).  In broad terms, if the prosecutor is prosecuting, there is absolute immunity; if the prosecutor is investigating or policing, there is not. *Id.* at 29 (stating "absolute immunity protects the prosecutor's role as advocate for the State, and not his or her roles as an administrator or investigator") (punctuation and citation omitted); *see also Celia v. O'Malley*, 918 F.2d 1017, 1020 (1st Cir. 1990) (same).

When the functional approach described in *Burns* and *Buckley* is applied, the narrow question, here, becomes whether a review of the factual allegations in the Amended Complaint confirms that the State Defendants were engaged in actions more like a prosecutor or a police officer. *See Kyricopoulos v. Rollins*, No. 95-2143, 1996 U.S. App. LEXIS 15262, at *3 (1st Cir. Jun. 25, 1996) (affirming a dismissal of a claim against a district attorney and assistant district attorneys because "such conduct involves the initiation and presentation of the state's case"). Mr. Knowlton makes the following general allegations in Count I of the Amended Complaint:

1)  On or about April 5, 2005, the [Bureau] represented by Judith Shaw and Glen (sic) Griswold entered into a Consent Agreement with Alan D. Knowlton and the Maine Office of the Attorney General represented by Andrew Black. *Am. Compl.* ¶ 29.

2) The Consent Agreement, by its own terms, constitutes a binding contract between Alan D. Knowlton, the Bureau, and the Attorney General's Office.  *Id.* ¶ 30.

3) Included in paragraph twenty-five of the April 5, 2005 Consent Agreement with Alan Knowlton was the covenant that the Bureau and the Office of the Attorney General "agree to forego pursuing further disciplinary measures or other civil or administrative sanctions against Mr. Knowlton for violations described in the Stipulations, other than those agreed to in this Consent Agreement."  *Id.* ¶ 31.

4) While promising Alan Knowlton that no further civil or administrative sanctions would be taken against him the Defendants Judith Shaw, Glenn Griswold and Andrew Black were negotiating his termination in a Consent Agreement with Bankers Life.  *Id.* ¶ 32.

5) Subsequently, on or about April 11, 2005, the [Bureau] represented by Judith Shaw and Glenn Griswold and the Attorney General's Office represented by Andrew Black entered into a separate Consent Agreement with the Plaintiff's employer, Bankers Life for offenses arising out of the operation of Bankers Life South Portland Office.  *Id.* ¶ 33.

6) As part of the negotiations of the terms of the April 11, 2005 Consent Agreement between the Bureau and Bankers Life, Judith Shaw, Glen (sic) Griswold, and Andrew Black agreed to insert language requested by Bankers Life that required that Alan Knowlton be terminated as a branch manager of Bankers Life Bangor office.  *Id.* ¶ 34.

7) The April 11, 2205 (sic) Consent Agreement between Bankers Life, the Bureau represented by Judith Shaw and Glenn Griswold and the Attorney General's Office represented by Andrew Black contains a clause stating "Nothing in this agreement

shall affect the rights, interests, duties or obligations of any person who is not a party to this agreement." *Id.* ¶ 35.

8) The April 11, 2005 Consent Agreement between Bankers Life and the Bureau contains a clause requiring that Mr. Knowlton be terminated from his duties as the Branch Manager of the Bangor office of Bankers Life. *Id.* ¶ 37.

9) Judith Shaw, Glenn Griswold, and Andrew Black were acting under the color of state law in executing the April 5, 2005 Consent Agreement between the Bureau, the Attorney General's office and Mr. Knowlton. *Id.* ¶ 38.

10) Judith Shaw, Glenn Griswold, and Andrew Black were acting under the color of state law in executing the April 11, 2005 Consent Agreement between Bankers Life, the [Bureau], and the Attorney General's office. *Id.* ¶ 39.

11) Judith Shaw, Glenn Griswold, and Andrew Black's execution of the April 11, 2005 Consent Agreement between Bankers Life, the Bureau and the Attorney General's Office deprived Mr. Knowlton of a constitutionally protected property interest without due process of law. *Id.* ¶ 42.

12) Judith Shaw, Glenn Griswold, and Andrew Black's failure to notify Mr. Knowlton and allow him to be heard as well as the failure to advise Mr. Knowlton of the specific complaints in Exhibit A of the April 11, 2005 Consent Agreement between Bankers Life, the [Bureau] and the Attorney General's Office which related to Mr. Knowlton or the branch he managed, deprived Mr. Knowlton of an opportunity to confront the witnesses against him and to put on evidence to support him. *Id.* ¶ 43.

13) Judith Shaw, Glenn Griswold, and Andrew Black's actions, under the color of state law, in depriving Mr. Knowlton of a constitutionally protected property interest without due process of law constitutes a violation of Title 42 U.S.C. § 1983. *Id.* ¶ 44.

14) As a direct and proximate result of the Defendants' violation of Title 42 U.S.C. § 1983, Mr. Knowlton has been forced to leave a position he held for 20 years and has suffered severe and debilitating economic and emotional distress. *Id.* ¶ 45.

For State Defendants Judith Shaw and Andrew Black, he makes substantially identical allegations against each in the due process punitive damages counts:

15) Judith Shaw (Andrew Black) [have] a law degree, [have] practiced law, and [have] been [members] of the Maine Bar. *Id.* ¶ 47, 66.

16) Judith Shaw (Andrew Black) [are] aware that an individual can have a constitutionally protected property interest in their job. *Id.* ¶ 48, 67.

17) Judith Shaw (Andrew Black) [have] knowledge that depriving an individual of a constitutionally protected property interest without due process of law is a violation of their civil rights. *Id.* ¶ 49, 68.

18) Judith Shaw (Andrew Black) did nothing to ascertain whether Alan Knowlton had a constitutionally protected property interest in his job. *Id.* ¶ 50, 69.

19) Judith Shaw (Andrew Black) did not give Alan Knowlton notice or an opportunity to be heard before entering into the April 11, 2005 Consent Agreement with Bankers Life, which required Mr. Knowlton's termination as Branch Manager of the Bangor Office of Bankers Life. *Id.* ¶ 51, 70.

20) The April 11, 2005 Consent Agreement between the [Bureau] and Bankers Life did effect Mr. Knowlton's rights by requiring that he be terminated from his position as the Branch Sales Manager of Bankers Life.  *Id.* ¶ 54, 73.

21) As a direct and proximate result of Judith Shaw's (Andrew Black's) actions, Alan Knowlton suffered economic loss and emotional distress.  *Id.* ¶ 55, 74.

22) Judith Shaw's (Andrew Black's) actions were in reckless disregard of Alan Knowlton's civil rights and warrant the imposition of punitive damages.  *Id.* ¶ 56, 75.

The punitive damages for the unconstitutional impairment of contractual obligation allegation against Ms. Shaw and Mr. Black, though phrased slightly differently, allege that they were aware that the United States Constitution prohibits the impairment of contractual obligations by the Government, that they knew that an unconstitutional impairment of contractual obligations is a violation of a person's civil rights, that they did not give notice to Mr. Knowlton, that the April 11, 2005 Consent Agreement required Bankers Life to terminate Mr. Knowlton, and that it did so, causing Mr. Knowlton economic loss and emotional distress.  *Id.* ¶¶ 93-100; 109-17.

The final set of allegations against all the State Defendants is the conspiracy count:

23)   In or around 2001 Van Sullivan within the Market Conduct Division of the Maine Bureau of Insurance under the auspices of Deputy Superintendent, Eric Ciopaa, began conducting an investigation into the market conduct practices of Bankers Life and Casualty Company, with a specific focus on certain sales practices which targeted elderly consumers.  *Id.* ¶ 128.

24)   As part of the Bureau's market conduct investigations, conducted by Van Sullivan, into Bankers Life evidence of significant violations in the South Portland office of Bankers Life was discovered.  *Id.* ¶ 129.

25)  The Maine Bureau of Insurance market conduct investigation conducted by Van Sullivan

into Bankers Life did not reveal any evidence of significant violations in the Bangor office of

Bankers Life.  *Id.* ¶ 130.

26)  In or around 2002, Judith Shaw, Deputy Superintendent in charge of the Consumer Healthcare Division of the Maine Bureau of Insurance, learned from Glenn Griswold that there appeared to be a fairly substantial number of consumer complaints filed against Bankers Life.  *Id.* ¶ 131.

27) After learning of the substantial number of complain[t]s against Bankers Life, Judith Shaw in her capacity as the Deputy Superintendent in charge of the Healthcare Division of the Maine Bureau of Insurance directed Glenn Griswold to assign investigators to determine whether Bankers Life was engaging in systemic improper sales practices. *Id.* ¶ 132.

28) At Deputy Superintendent Shaw's request Glenn Griswold, Directory (sic) of the Consumer Healthcare for the Bureau, assigned Mike McGonigle and Linda Dion, his two most senior investigators to determine whether Bankers Life was engaging in systemic improper sales practices. *Id.* ¶ 133.

29) Neither Mike McGonigle nor Linda Dion could identify any management or other practices which Mr. Knowlton engaged in which led to any systemic improper sales actions in the Bangor office of Bankers Life.  *Id.* ¶ 134.

30) The market conduct investigation of Bankers Life conducted by Van Sullivan of the Bureau was turned over to Deputy Superintendent Judith Shaw in 2002.  *Id.* ¶ 135.

31) Deputy Superintendent Judith Shaw, Assistant Attorney General Andrew Black, and Director Glenn Griswold never reviewed the market conduct investigation conducted by Van Sullivan of the Maine Bureau of Insurance.  *Id.* ¶ 136.

32) In or around January of 2005, Judith Shaw, Andrew Black, and Glenn Griswold on behalf of the State of Maine began negotiating with James Valdez and others at Bankers Life to

resolve claims that Bankers Life had engaged in improper sales techniques targeting elderly individuals in the State of Maine.  *Id.* ¶ 137.

33) As part of negotiations which led to the April 2005 Consent Agreement between Bankers Life, the Maine Bureau of Insurance, and the Maine Attorney General's Office, the Bureau originally proposed that Bankers Life agree to an audit of the managers' practices in the Bangor and South Portland offices of Bankers Life.  *Id.* ¶ 138.

34) During the negotiations which led to the April 2005 Consent Agreement between Bankers Life, the Maine Bureau of Insurance, and the Maine Attorney General's Office, Bankers Life requested that the Bureau insert language into the Consent Agreement which stated that the Bureau had investigated the complaints involving current managers of the South Portland and Bangor offices of Bankers Life.  *Id.* ¶ 139.

35) During the negotiations which led to the April 2005 Consent Agreement between Bankers Life, the Maine Bureau of Insurance, and the Maine Attorney General's Office, the Bureau refused to include language in the Consent Agreement which stated that the Bureau had investigated the complaints involving current managers of the South Portland and Bangor offices of Bankers Life.  Because the Bureau had not investigated the managers of the South Portland and Bangor offices of Bankers Life.  *Id.* ¶ 140.

36) The April 2005 Consent Agreement between Bankers Life, the Maine Bureau of Insurance, and the Maine Attorney General's Office requires that among other things Mr. Knowlton, as manager of the Bangor office of Bankers Life be removed from his position as Manager.  *Id.* ¶ 141.

37) James Valdez, Michael Buckley, and Bruce Jordan all repeatedly represented to Mr. Knowlton that the Bureau required his termination as a condition of the April 2005 Consent Agreement between Bankers Life, the Maine Bureau of Insurance, and the Maine Attorney General's Office.  *Id.* ¶ 142.

38) The April 2005 Consent Agreement between Bankers Life, the Maine Bureau of Insurance, and the Maine Attorney General's Office included a provision that the agreement would not impact the rights of third parties. *Id.* ¶ 143.

39) The April 2005 Consent Agreement between Bankers Life, the Maine Bureau of Insurance, and the Maine Attorney General's Office impacted Alan Knowlton's, who was not a party to the agreement, due process rights. *Id.* ¶ 144.

40) Judith Shaw, Andrew Black, Glenn Griswold, and James Valdez conspired to deprive judicially Mr. Knowlton of his due process rights to challenge the Maine Bureau of Insurance's requirement that he be terminated from his position as Branch Manager of the Bangor office of Bankers Life. *Id.* ¶ 145.

41) As a direct and proximate result of the conspiracy between the Maine Bureau of Insurance and Bankers Life in violation of Title 42 U.S.C. §1985 (2), Mr. Knowlton has been forced to leave a position he held for 20 years and has suffered severe and debilitating economic and emotional distress. *Id.* ¶ 146.

Carefully reviewing all Mr. Knowlton's allegations, the Court concludes that in performing the acts set forth in his Amended Complaint, the State Defendants were acting as prosecutors of a civil violation, not as police officers, and that they are therefore entitled to absolute immunity under *Buckley.* The essence of Mr. Knowlton's complaint against the State Defendants rests with their negotiating, drafting and executing the Consent Agreements in this case to resolve civil violations by Bankers Life. In performing these duties, the State Defendants were acting much more like prosecutors than investigators or police; they were "initiating and pursuing civil and administrative enforcement proceedings." *Hoffman*, 2009 U.S. Dist. LEXIS 92340, at *24 n.5 (quoting *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1489-90 (10th Cir. 1991)). In fact, to the extent Mr. Knowlton's complaint addresses an investigation, he says that the State Defendants are at fault not

for performing one, but in commissioning one and failing to review and consider its findings. *Am. Compl.* ¶¶ 27-31.

In addition to contending that the State Defendants were engaged in investigative work for which absolute immunity should not apply, Mr. Knowlton argues that the State Defendants should not receive absolute immunity because "[i]t is impossible to say that the actions taken against Mr. Knowlton as part of the consent decree between Bankers Life and the Bureau of Insurance were part of some prosecution of Mr. Knowlton." *Pl.'s Resp. to State Defs.' Mot.* at 12-13.  He describes himself as "collateral damage" to the Consent Agreement between the State and Bankers Life. *Id.* at 13.  But, state prosecutors have absolute immunity even though their actions have profound direct and indirect effects; thus, absolute immunity can apply even to injuries caused to innocent victims. *Schrob*, 948 F.2d at 1417 (stating that "[a]bsolute immunity applies if the action at issue was taken in furtherance of prosecutorial duties even though the prosecutor inadvertently injures an innocent person"); *Atkins v. Lanning*, 556 F.2d 485, 487-88 (10th Cir. 1977) (per curiam) (district attorney absolutely immune from suit for naming wrong person in arrest warrant).  Here, unlike the wrong person the district attorney named in *Atkins*, Mr. Knowlton was not a stranger to Bankers Life and for whatever reason fell within the State Defendants' area of concern.  The fact Mr. Knowlton was not a party to the Consent Agreement does not mean the State Defendants are deprived of absolute immunity.

Finally, Mr. Knowlton says that the State Defendants are "judicially estopped" from denying liability under 42 U.S.C. § 1983 because the State took a position before the Maine Supreme Judicial Court that is contrary to the position the State Defendants are taking in their motion to dismiss. *Pl.'s Resp. to State Defs.' Mot.* at 7-10.  Mr. Knowlton previously sued the Attorney General and the Superintendent of Insurance for the state of Maine in state court.  On July 28, 2009, the Maine Supreme Judicial Court vacated a judgment in favor of Mr. Knowlton, and concluded that the State was immune from suit. *Knowlton v. Attorney General*, 2009 ME 79, 976 A.2d 973.  In his Response

24

to the State Defendants' motion to dismiss in this case, Mr. Knowlton quotes the State's Attorney's answer during oral argument before the Maine Supreme Judicial Court as stating that "the State may or may not have acted properly and certainly there is a section 1983 remedy for that, I think." *Pl.'s Resp. to State Defs.' Mot.* at 9.  He says that since the State made this representation before the Maine Supreme Judicial Court, the State cannot now act in a manner "inconsistent with its prior position." *Id.*  In support, Mr. Knowlton quotes the Supreme Court's definition of judicial estoppel: "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1985)).

The basic flaw, however, in Mr. Knowlton's argument is that the three State Defendants were not parties to the earlier state proceeding.  In the state proceeding, Mr. Knowlton sued the Attorney General and the Superintendent of Insurance; here, he is suing each of the State Defendants, not as state official, but in their individual capacities.  *Am. Compl.* ¶¶ 2-4 (stating as to each that they are being sued "in her [his] individual capacity").  The doctrine of judicial estoppel applies only the claims by the same party in a prior action.  *New Hampshire*, 532 U.S. at 749 (quoting 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000) (stating that the doctrine of judicial estoppel prevents "a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken *by that party* in a previous proceeding") (emphasis supplied)).  Because the parties are different, the doctrine of judicial estoppel does not apply.  *Rederford v. US Airways, Inc.*, 589 F.3d 30, 38 (1st Cir. 2009) (stating that the "doctrine of judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase") (internal punctuation and citation omitted); *Intergen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003) (stating that "[a]s a general matter, the doctrine of judicial estoppel prevents a litigant

25

from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding"); *In re Hannaford Bros. Co.*, MDL Docket No. 2:08-MD-1954, 2009 U.S. Dist. LEXIS 106958, at *14 (D. Me. Nov. 16, 2009).

### 2.    42 U.S.C. § 1985:  Count XI

In Count XI of the Amended Complaint, Mr. Knowlton charges the State Defendants, Bankers Life, and James Valdez with engaging in a conspiracy to violate his civil rights by terminating his employment position without due process of law; Mr. Knowlton claims relief under 42 U.S.C. § 1985(2).  *Am. Compl.* ¶¶ 127-46.  The Bankers Life Defendants and the State Defendants moved to dismiss Count XI of the Amended Complaint on the ground that the alleged facts fail to state a § 1985(2) claim.  *Bankers' Mot.* at 6; *State Defs.' Mot.* at 12-16.

The first part of § 1985(2) reads:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or his being or having been such juror . . .

42 U.S.C. § 1985(2).  In *Hahn v. Sargent*, the First Circuit stated that "[t]he first part of § 1985(2), preceding the semicolon, is addressed to conspiracies to interfere with parties, jurors or witnesses in proceedings in federal courts." 523 F.2d 461, 469 (1st Cir. 1975).   There is no suggestion in any of Mr. Knowlton's factual allegations that the first part of § 1985(2) applies.

The second phrase reads:

> [I]f two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws

26

42 U.S.C. § 1985(2).   Mr. Knowlton claims that this second section applies because the State Defendants conspired with others to deprive him of a constitutionally protected property interest, namely his job with Bankers Life.   *Pl.'s Resp. to Bankers' Mot.* at 8-9; *Pl.'s Resp. to State Defs.' Mot.* at 18.   He says that if he had a constitutionally protected interest in his job, he could not be terminated without due process.   *Id.* at 9, 18.

However, as the State Defendants point out, § 1985(2) was enacted as part of the Civil Rights Act of 1866 to afford black citizens a remedy for racial discrimination.   *State Defs.' Mot.* at 14. Thus, "[i]n order to state a cause of action under the second clause of 42 U.S.C. § 1985(2), plaintiff was required to allege class-based, invidiously discriminatory animus."   *Greco v. Fitzpatrick*, No. 94-2248, 1995 U.S. App. LEXIS 15563, at *3 (1st Cir. Jun. 23, 1995); *Hahn*, 523 F.2d at 469 (stating that "[h]aving established no 'class-based, invidiously discriminatory animus', appellant can proceed no farther under the second part of § 1985(2)").   To sustain a § 1985(2) claim, Mr. Knowlton must have alleged "that he was the victim of conduct so motivated."   *Milios v. Mashantucket Pequot Tribal Nation*, 60 Fed. Appx. 337, 338 (1st Cir. 2003).   He has not, and Count XI of his Amended Complaint does not state a viable claim against either the Bankers Life or the State Defendants under 42 U.S.C. § 1985(2).

## III.   CONCLUSION

The Court DENIES Defendants Bankers Life and Casualty Company, Michael Buckley, Bruce Jordan and James Valdez's Motion to Dismiss Under Rule 12(b)(6), except the Court GRANTS Defendants James Valdez's Motion to Dismiss Count XV and Michael Buckley's Motion to Dismiss Count XVIII only to the extent the Plaintiff's Amended Complaint alleges slander *per se* arising from a statement by James Valdez on June 27, 2006 and a statement by Michael Buckley on July 7, 2006, and the Court GRANTS the Motion as to Count XI (Docket # 23).   The Court GRANTS the Motion to Dismiss of Defendants Judith Shaw, Andrew Black and Glenn Griswold (Docket # 29).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 27th day of April, 2010