## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

ALAN KNOWLTON,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )        1:09-cv-00334-JAW
                                  )
JUDITH SHAW, et al.,              )
                                  )
            Defendant.            )

## ORDER ON MOTION FOR SUMMARY JUDGMENT

In an action by a former employee against his former employer and its representatives asserting causes of action under 42 U.S.C. § 1983, slander, intentional and fraudulent misrepresentation, breach of contract, breach of good faith and fair dealing, and promissory estoppel, and requesting punitive damages, the Defendants move for summary judgment. The Court concludes: 1) the § 1983 claims must be dismissed because, under Illinois law, the Plaintiff was an at-will employee and lacked a property interest in continued employment; 2) the slander claims must be dismissed because they are based on speculation and character evidence and because they fail to link the Defendants to the allegedly slanderous material; 3) the breach of contract, breach of good faith and fair dealing, and promissory estoppel claims must be dismissed because the employment contract made clear that the Plaintiff was an at-will employee and the employer's policies did not alter the contract; 4) the negligent and fraudulent misrepresentation claims

survive to the extent they seek to recover for economic loss; and, 5) the punitive damages count survives.

## I.    STATEMENT OF FACTS

### A.    General Overview

On July 2, 2009, Alan D. Knowlton filed suit in Superior Court, Penobscot County, state of Maine, against a number of state of Maine Defendants.[1] *Notice of Removal* (Docket # 1) Attach. 1 at 1. The case was removed to this Court on July 28, 2009. *Notice of Removal.* Mr. Knowlton later amended his complaint to include two additional state of Maine Defendants; Bankers Life and Casualty Co. (Bankers Life); James Valdez, Vice President and Associate General Counsel of Bankers Life; Michael Buckley, Vice President of Bankers Life; and Bruce Jordan, Regional Director of Bankers Life.[2] *First. Am. Compl.* at 1–2 (Docket # 11) (*Am. Compl.*). The Amended Complaint claims multiple violations of 42 U.S.C. § 1983 including Deprivation of a Property Interest without Due Process of Law (Counts I through V) and Unconstitutional Impairment of Contractual Obligations (Counts VI through X); Conspiracy to Violate Civil Rights under 42 U.S.C. § 1985(2) (Count XI); Negligent Misrepresentation (Counts XII, XIII, XVI and XIX); Fraudulent and Intentional Misrepresentation (Counts XIV, XVII and XX); Slander (Counts XV and

---

[1] The original state of Maine Defendants included Judith Shaw, Deputy Superintendent for the Bureau of Insurance, Andrew Black, Assistant Attorney General, and Glenn Griswold, Director of Consumer Health Care Division of the Bureau of Insurance. *Notice of Removal* (Docket # 1) Attach. 1 at 1. On January 5, 2010, these Defendants moved to dismiss. *Mot. to Dismiss of Defs. Judith Shaw, Andrew Black and Glenn Griswold* (Docket # 29). On April 27, 2010, the Court granted this motion. *Order on Mot. to Dismiss* (Docket # 46).

[2] The additional state of Maine Defendants included Mila Kofman, Superintendent of Insurance and Janet Mills, Attorney General. *Compl.* On February 17, 2010, Mr. Knowlton moved to dismiss his complaint against Superintendent Kofman and Attorney General Mills, and on February 19, 2010, the Court granted Mr. Knowlton's motion. *Mot. to Dismiss* (Docket # 43); *Order* (Docket # 45),

XVIII); Breach of Contract (Count XXI); Breach of Implied Covenant of Good Faith and Fair Dealing (Count XXII); and Promissory Estoppel/Detrimental Reliance (Count XXIII). *Am. Compl.*

### 1. Mr. Knowlton's Complaint

Bankers Life hired Alan D. Knowlton in New Hampshire as a sales agent in November 1980 and in May 1985, it transferred him to Bangor, Maine as the branch sales manager. Mr. Knowlton says he was successful in Bangor. The number of sales agents grew and the office became among the top fifty Bankers Life offices in the Country. Mr. Knowlton's immediate supervisor at Bankers Life was Leroy Kunselman, a Vice President. Mr. Kunselman told Mr. Knowlton it was Bankers Life's policy and practice to continue all branch sales managers in their positions unless they failed to perform or engaged in prohibited activity, an assertion Mr. Knowlton took as a promise. Accordingly, Mr. Knowlton worked hard with the expectation he would retire from Bankers Life upon his 56th birthday.

All went well until 2000, when the state of Maine began a "Market Conduct" investigation into Bankers Life's sales practices in Maine, focusing particularly on the South Portland branch office. When Deputy Superintendent of Insurance Judith Shaw expanded the investigation to the Bankers Life Bangor branch office, the only sales practice mistake she found was the office had mistakenly distributed literature describing Bankers Life as having an A.M. Best "A" rating when in fact it had a "B+" rating. Bankers Life hired an attorney to represent Mr. Knowlton on the complaint that he had distributed inaccurate literature, and on March 28, 2005, Mr. Knowlton and the state of Maine entered into a Consent Agreement in which

Mr. Knowlton agreed to pay a fine of $750 in return for the state's agreement to take no further action against him. Mr. Knowlton thought his problems with the state of Maine were over.

He was wrong. At the same time the state was negotiating with Mr. Knowlton regarding violations in the Bangor branch office, it was also negotiating with Bankers Life to resolve the systemic violations that had taken place in the South Portland branch office. The state was concerned that the South Portland office had inappropriately focused its sales on elderly Mainers. The state proposed to Bankers Life that it conduct an audit of both its South Portland and Bangor offices. Concerned that the audit would reveal the serious depth of the South Portland transgressions, Bankers Life proposed an alternative to the state: it would fire the South Portland and Bangor branch managers. Despite the state's March 28, 2005 Consent Agreement with Mr. Knowlton, the state and Bankers Life entered into a Consent Agreement on April 11, 2005 in which Bankers Life agreed to remove Mr. Knowlton from his position as the branch sales manager in the Bangor office.

Bankers Life lived up to its Consent Agreement with the state of Maine. On April 14, 2005, three of Mr. Knowlton's Bankers Life superiors, James Valdez, Michael Buckley, and Bruce Jordan, told him the state of Maine had concluded that South Portland and Bangor offices could not handle the offices' improper sales practices problems and, despite the fact Bankers Life did not want to remove him, the state had insisted on his removal as the branch sales manager for the Bangor

office.  All three men assured Mr. Knowlton that Bankers Life had fought with the Maine Bureau of Insurance to preserve his job but that the state had insisted upon his removal.  This, according to Mr. Knowlton, was a lie.  They all knew full well that it had been Bankers Life, not the state of Maine, which had proposed Mr. Knowlton's termination.

From then on, the Bankers Life supervisors continued to deceive Mr. Knowlton.  Reassuring him they knew he was not at fault, they told him he could work for Bankers Life in a new position in the commonwealth of Massachusetts as branch manager for the North Shore sales office; however, they said he would have to start out as a unit sales manager: in effect, a salesman.  They promised the salesman position would be temporary, and as soon as the North Shore branch was up and running, Mr. Knowlton would become its branch sales manager.

Personal lines insurance sales begin with personal relationships.  By transferring Mr. Knowlton from Bangor, where he had spent the last two decades, to north of Boston, where he knew no one, Bankers Life set up Mr. Knowlton for failure.  This is exactly what happened.  Mr. Knowlton could not succeed as an insurance salesman in Massachusetts and repeatedly requested that he be allowed to assume the promised position of North Shore branch manager.  The supervisors at Bankers Life, however, lied to him again and told him that the Consent Agreement with the state of Maine prohibited him from becoming a branch manager anywhere.

Bankers Life then engaged in a series of actions to force him to resign. It promised him a salary and then unilaterally cut him off, reinstated it upon his complaint, but then cut it off again. Ultimately Bankers Life was successful in its campaign to force Mr. Knowlton out of the company. After he left, Bankers Life lied about Mr. Knowlton, disparaging his honesty and competence and falsely asserting that he had been forced out of the Bangor branch manager position by the state of Maine.

### 2.     The Bankers Life View

Bankers Life tells a different story. Contrary to Mr. Knowlton's claim of superior performance as the Bangor branch office manager, Bankers Life says that from January 1, 2002 to April 11, 2005, the state of Maine Bureau of Insurance received 70 formal complaints alleging violations of the Maine Insurance Code by agents appointed by Bankers Life, including agents recruited, trained and supervised by Mr. Knowlton in the Bangor branch office. Bankers Life points to the Bureau of Insurance's conclusion that "neither the South Portland nor Bangor branch can be operated in full compliance with Maine law and this Consent Agreement as those branches are currently operated" and that it was incumbent upon Bankers Life to "take serious measures to create a new culture dedicated to the development and maintenance of a strong compliance philosophy." *The Bankers Life Defs.' Statement of Material Facts in Support of Their Mot. for Summ. J.* ¶ 17 (Docket # 60) (DSMF).

Bankers Life also disputes Mr. Knowlton's contention that it proposed his removal to avoid an audit. Instead, Bankers Life says the state of Maine insisted

6

upon his removal and rejected Bankers Life's suggestion that he be retained and retrained. In effect, Bankers Life says it capitulated to the state's demand that it relieve Mr. Knowlton of the managerial duties in Bangor.

Despite its reluctant acquiescence to the state's non-negotiable demands, Bankers Life insists that it sought to treat Mr. Knowlton fairly. It placed him on a paid leave of absence and made him a variety of job offers. After he accepted the North Shore position, it took the unusual step of paying him $9,000 a month in temporary financial support through July 2006. Over time, however, it became clear to Bankers Life that Mr. Knowlton was a failure as a sales agent in Massachusetts; he hired very few new agents and sold almost no policies. Observing that Mr. Knowlton refused to move from Maine to Massachusetts, Bankers Life suspected his heart was not in his job. Finally, in August 2006, Bankers Life told Mr. Knowlton he could continue to work there only if he agreed to relocate to Massachusetts and conform to certain performance standards. When Mr. Knowlton refused, Bankers Life terminated him effective March 16, 2007.

### 3. The Order on the Bankers Life Motion to Dismiss

On December 14, 2009, the Bankers Life Defendants moved to dismiss. *Defs. Bankers Life and Casualty Co., Michael Buckley, Bruce Jordan, and James Valdez's Mot. to Dismiss Under Rule 12(b)(6)* (Docket # 23) (*Bankers Life Defs.' Mot. to Dismiss*). On April 27, 2010, the Court granted this motion in part, denied it in part, and dismissed certain counts. *Order on Mots. to Dismiss* (Docket # 46). In ruling on the motion to dismiss, the Court deferred action on claims that relied upon the terms of the employment agreement between Mr. Knowlton and Bankers

Life because the employment contract was not properly before the Court.[3]  *Id.* at 6–9.

### B.     The Motion for Summary Judgment

On October 29, 2010, the Bankers Life Defendants moved for summary judgment on the remaining claims.  *The Bankers' Life Defs.' Mot. for Summ. J.* (Docket # 59) (*Defs.' Mot.*).  Mr. Knowlton responded on November 18, 2010.  *Pl.'s Resp. to Bankers' Life Defs.' Mot. for Summ. J.* (Docket # 61) (*Pl.'s Resp.*).  On December 9, 2010, the Bankers Life Defendants replied.  *The Bankers Life Defs.' Reply* (Docket # 66) (*Defs.' Reply*).

### C.     The Legal Positions

#### 1.     Bankers Life

Bankers Life bases its motion for summary judgment on a number of theories.  First, taking the next step from the Order on the Defendants' motions to dismiss, Bankers Life asserts that Mr. Knowlton has no evidence that either Mr. Valdez or Mr. Buckley slandered him within the applicable statute of limitations period: after July 2, 2007.  Second, Bankers Life says that Mr. Knowlton's contract claims cannot proceed because the written contract provides unequivocally that Bankers Life could terminate his employment at will and without cause.  Further, it says that the contractual provision addressing policies and procedures is one-sided, obligating Mr. Knowlton to comply with Bankers Life policies and procedures, not obligating Bankers Life to comply with its own policies and procedures, and in any

---

[3] The Court dismissed the two slander claims (Counts XV and XVII) to the extent they arose from a statement by Mr. Valdez on June 27, 2006, *Order on Mots. to Dismiss* at 11–12.

event, the contract itself takes precedence over any other Bankers Life documents or the oral representations of a Bankers Life supervisor. Bankers Life cites Maine case law as supporting its contention that an employment contract without term is terminable at will. Bankers Life then disputes the sufficiency of each of the remaining theories upon which Mr. Knowlton is attempting to proceed.

### 2. Alan Knowlton's Response

Mr. Knowlton first posits a choice of law issue: he says that the contract must be interpreted under Illinois state law and that the tort claims fall under Maine state law. He then claims that Bankers Life's motion must fail because it has not yet presented a complete employment contract for the Court's review. Next he contends that Illinois law creates a rebuttable presumption that an employment contract is at will and he argues that in this case, the facts generate a factual question as to whether he has successfully rebutted the Illinois presumption. In addition, he says that Illinois law recognizes the contractual obligation of good faith and fair dealing in employment contracts. Mr. Knowlton says he avoids the statute of limitations on the slander claim because the Consent Agreement is still being published and Bankers Life employees are still reiterating allegations of his supposed incompetency.

### D. The Dispute

### 1. A Fractured Set of Facts

As a result of multiple requests to strike, objections, and qualified responses, the parties have presented a fractured evidentiary basis for the Court's consideration. Out of Bankers Life's fifty eight supposedly undisputed material

facts, Mr. Knowlton admitted only six without qualification, objection, or requests to strike. *Resp. to Defs.' Statement of Material Facts* (Docket # 62) (PRDSMF). The admitted facts include only the most incontestable assertions, such as that Mr. Knowlton is a former employee of Bankers Life and that in his amended complaint, he asserted claims for slander *per se* against defendants Buckley and Valdez. DSMF ¶¶ 1, 48; PRDSMF ¶¶ 1, 48. Otherwise, everything is qualified, objected to, or denied. Not to be outdone, out of Mr. Knowlton's seventy-two additional supposedly undisputed material facts, Bankers Life admitted ten; again only the most unarguable, such as that Bankers Life hired Mr. Knowlton in November 1980, and vigorously contested all the rest. *Pl.'s Statement of Additional Material Facts* ¶ 59 (Docket # 62) (PSAMF); *Resp. to Pl.'s Statement of Additional Material Facts* ¶ 59 (Docket # 67) (DRPSAMF). Based on the narrow set of the admitted facts, the motion for summary judgment cannot proceed to the merits and on that basis, the Court would summarily deny Bankers Life's dispositive motion.

### 2. Requests to Strike and Objections

Obscured by the quibbling is the substantive significance of the legal issues. To reach the merits, the Court is required to cut through the thicket of the parties' motions to strike and objections to determine whether, after resolving them, what remains truly generates a triable issue.

### 3. The Defendant's Statement of Material Facts and the Plaintiff's Qualified Responses, Objections and Requests to Strike

#### a. DSMF Paragraphs 2 Through 4: Objections

Mr. Knowlton's first set of objections—based on relevance—is to Bankers Life statement of material facts paragraphs 2 through 4. PRDSMF ¶¶ 2–4. These paragraphs relate to the filing and ultimate disposition of Mr. Knowlton's original lawsuit against the Maine Attorney General and the Maine Superintendent of Insurance. The Court sustains the relevancy objection since the earlier lawsuit has no bearing on the appropriate disposition of Bankers Life's dispositive motion on this lawsuit.

### b.     DSMF Paragraphs 5 and 6:  Qualified Responses

Bankers Life's statement of material facts paragraph 5 states:

> On July 2, 2009, Knowlton filed a second lawsuit against state actors Judith Shaw, Andrew Black and Glenn Griswold, in their individual capacities.

DSMF ¶ 5. Mr. Knowlton interposed a qualified objection, noting in essence that his second lawsuit was based on "Justice Silver's comments during oral arguments in the contract action against the State." PRDSMF ¶ 5. This is a frivolous qualification to Bankers Life's statement of material facts since the paragraph only asked Mr. Knowlton to admit he filed the lawsuit, not why he filed it. The Court refuses to accept the qualified response to Bankers Life's statement of material facts paragraph 5 and deems the fact admitted.

Bankers Life's statement of material facts paragraph 6 states:

> He later amended the complaint to join Bankers Life and its employees, Michael Buckley, Bruce Jordan, and James Valdez.

DSMF ¶ 6. Mr. Knowlton interposed a qualified response, noting that after he "learned that Bankers had made representations to him [that] were untrue, he

brought an action against them . . . [and that the] action is premised on the facts of the case, the terms of the contract, the policies, procedures, and practices of Bankers Life and his understanding of his rights under Maine and Illinois law." PRDSMF ¶ 6.

The Court refuses to accept Mr. Knowlton's qualified response to Bankers Life's paragraph 6. This paragraph only asserted that Mr. Knowlton amended his complaint to include Bankers Life and three employees. Again, it did not ask why he did so. Mr. Knowlton should have admitted the assertion without qualification since it is undeniable he amended his complaint to add Bankers Life. The Court deems Bankers Life statement of material facts paragraph 6 admitted.

### c.    DSMF Paragraph 9:  Request to Strike

Bankers Life statement of material facts paragraph 9 states:

> This contract contains provisions that are substantially the same as those in the 1995 Contract.

DSMF ¶ 9. Mr. Knowlton asks the Court to strike this paragraph because it is "vague and ambiguous." PRDSMF ¶ 9. First, he says he does not know which contract the paragraph is referring to. *Id.* For purposes of this Order, the Court notes that paragraph 9 follows paragraphs 7 and 8, which refer to the two contracts Mr. Knowlton himself signed in January 1995 and January 2006, and therefore paragraph 9 must refer to the similarity of the January 2006 contract and the January 1995 contract. Second, Mr. Knowlton says that the contracts speak for themselves and Bankers Life should identify the specific provisions its contents are similar. *Id.* The Court denies Mr. Knowlton's request to strike. The assertion is

either correct or not and should have been answered. Failing a response, the Court treats Bankers Life's statement of material facts paragraph 9 as admitted.

### d. DSMF Paragraph 10: Request to Strike

Bankers Life's statement of material facts paragraph 10 reads:

> Because Mr. Knowlton has alleged that Bankers Life terminated him in 2005, the Contract governs this lawsuit, though both contracts produce the same result.

DSMF ¶ 10 (internal citation omitted). Mr. Knowlton admits the first part of this assertion, namely that the 1995 contract is the relevant agreement, but asks the Court to strike the last phrase as argumentative and a conclusion of law, not a statement of fact. PRDSMF ¶ 10. As the parties agree that the 1995 contract is the operative document, the Court agrees that it is not relevant whether the January 2006 contract would produce the same result and the Court strikes the last phrase in Bankers Life's statement of material facts paragraph 10.

### e. DSMF Paragraphs 11, 13, 14 : Qualified Responses

Bankers Life's statement of material facts paragraph 11 states:

> Mr. Knowlton's Contract provided that "[e]ither party may terminate this contract at will, without cause, by giving written notice to the other party.

DSMF ¶ 11. Paragraph 13 states:

> The Contract further provided that it "supersedes and terminates all previous Contracts, any oral representations or understandings and constitutes the entire Contract between the parties."

DSMF ¶ 13. Paragraph 14 states:

> Moreover, the Contract further provided that it could only be "changed or modified by written consent signed on behalf of the Company."

DSMF ¶ 14. In each of his responses to these material facts, Mr. Knowlton admits that the contract contains the indicated provision. However, for each, he interposes a qualified response, noting that the Contract contains other provisions as well. The Court strikes Mr. Knowlton's qualified responses. If Mr. Knowlton wishes to posit different contractual clauses, he should do so in his statement of material facts, not as a qualification to the Bankers Life's facts, the accuracy of which he admits. The Court treats Mr. Knowlton's response to Bankers Life's statement of material facts paragraphs 11, 13, and 14 as admitted without qualification.

### f.    DSMF Paragraph 15:  Request to Strike

Bankers Life's statement of material facts paragraph 15 states:

> Mr. Knowlton has no evidence that the termination provision of the Contract was modified such that the Contract was no longer terminable at will.

DSMF ¶ 15. Mr. Knowlton requests that the Court strike this paragraph on the ground that it failed to comply with the Local Rule by omitting a record citation. PRDSMF ¶ 15 (citing D. Me. Loc. R. 56(b), (f)).

Mr. Knowlton's objection poses a puzzle: how a movant, who is attempting to establish the absence of a fact, cites the record to establish that certain evidence does not exist. The assertion of the lack of evidence is often more a legal argument than a statement of fact. Nevertheless, to the extent a movant wishes to establish an absence of evidence—for example an absence of expert testimony in a medical malpractice case—the movant implicitly cites the entire record. In effect, the movant's assertion of an absence of evidence places the non-movant on notice that

the countervailing statement of facts should posit evidence on this issue. The Court denies Mr. Knowlton's request to strike on that basis.

However, the Court grants the motion to strike on a different basis. It is clear from Mr. Knowlton's statement of material facts that he contends Bankers Life made oral promises to him, and that these formed part of the contract since they are, in his view, "policies, practices, and procedures" of Bankers Life. Whether Mr. Knowlton is legally correct is one thing. However, Bankers Life's assertion of fact effectively asks Mr. Knowlton to admit what Bankers Life knows he denies, and thus is argumentative. To that extent, the Court grants Mr. Knowlton's request to strike Bankers Life's statement of material facts paragraph 15.

### g. DSMF Paragraphs 16, 17, 19, 20 and 21: Qualified Responses

Bankers Life's statement of material facts paragraph 16 reads:

> According to the consent agreement, between January 1, 2002, and April 11, 2005, the Bureau received 70 formal complaints alleging violations of the Maine Insurance Code by agents appointed by Bankers Life, including agents recruited, trained and supervised by Mr. Knowlton in the Bangor branch office.

DSMF ¶ 16. Bankers Life statement of material facts paragraph 17 reads:

> Based on these complaints, the Bureau reached the following conclusion:

> It is the position of the Bureau of Insurance that the substantial number and nature of consumer complaints received by the Bureau related to Bankers Life and its Maine producers, branch and unit managers, represents an unacceptable level of incompetence with respect to the elderly population to which Bankers Life's products are sold, and a lack of adherence to legal requirements; therefore, neither the South Portland nor Bangor branch can be operated in full compliance with Maine law and this Consent Agreement as those branches are currently operated. As such, it is necessary for Bankers

Life to take serious measures to create a new culture dedicated to the development and maintenance of a strong compliance philosophy.

DSMF ¶ 17.  Bankers Life's statement of material facts paragraph 19 reads:

> Among many other provisions, the consent agreement required that "Bankers Life shall relieve the managers of its South Portland and Bangor branch offices of their positions as branch managers."

DSMF ¶ 19.  Bankers Life statement of material facts paragraph 20 reads:

> The consent agreement further provided that "Bankers Life shall suspend the sale of all deferred annuity products in the State of Maine until such time as Bankers Life replaces the current managers of the South Portland and Bangor branches as set forth in paragraph 53 above."

DSMF ¶ 20.  Bankers Life statement of material facts paragraph 21 reads:

> Judith Shaw, the Deputy Superintendent of Insurance, testified in her affidavit that the removal of the branch managers "was predicated on the Bureau's position" that the two branch offices were not being competently managed and that Bankers Life was required to take "serious measures" to change the culture in those offices.

DSMF ¶ 21.

Although Mr. Knowlton admitted the content of each of these paragraphs, he interposed a qualified response for each, adding his own facts.  PRDSMF ¶¶ 16, 17, 19, 20, 21.   The Court treats each of these responses as admitted without qualification.  If Mr. Knowlton wished to posit additional evidence, he was free to do so in his additional statement of material facts.

### h.    DSMF Paragraph 18: Request to Strike

Bankers Life's statement of material facts paragraph 18 reads:

> To address this situation, the Bureau and Bankers Life entered into the consent agreement on April 11, 2005.

DSMF ¶ 18.  Although Mr. Knowlton admitted that the Bureau and Bankers Life entered into a consent agreement, he requested the Court strike the introductory phrase "[t]o address this situation," claiming it is "vague and ambiguous." PRDSMF ¶ 18.  He said he "assumes but does not know" that the phrase refers to the substance of the prior paragraph, and he complains that Defendants "offer no record citation concerning why Bankers Life 'addressed this situation.'" *Id.*

The Court denies Mr. Knowlton's request to strike.  It is abundantly clear that Bankers Life's introductory phrase incorporated the prior material fact. Furthermore, the phrase is neither vague nor ambiguous.  While Banker's Life could have supplied a record for its contention that it entered the consent agreement because of the Bureau's concern with its South Portland and Bangor branch management, it is a logical inference, which requires no such citation.  In any event, Mr. Knowlton effectively denied it.

### i.      DSMF Paragraph 22:  Qualified Response

Bankers Life's statement of material facts paragraph 22 reads:

> Mr. Knowlton was not involved in the discussions between the Bureau and Bankers Life, and therefore has no personal knowledge of what the Bureau required.

DSMF ¶ 22.  Mr. Knowlton interposed a qualified response, conceding that he was not present during these discussions but insisting that he had personal knowledge because he sat through the discovery depositions of the participants.  PRDSMF ¶ 22.

The Court rejects the qualified response and deems paragraph 22 admitted. Even though Mr. Knowlton sat through the depositions of the Bankers Life and

Bureau employees who negotiated the consent agreement, he has no personal knowledge of what the Bureau required while the agreement was being negotiated. He knows only what the Bureau and the Bankers Life employees say the Bureau required.

### j.     DSMF Paragraph 23: Request to Strike

Bankers Life's statement of material facts paragraph 23 reads:

> By contrast, James Valdez represented Bankers Life in the negotiations with the Bureau and does have personal knowledge as to what the Bureau required.

DSMF ¶ 23.  Mr. Knowlton admitted the substance of this paragraph but requests that the Court strike the first phrase, "[b]y contrast," stating that the phrase "is argumentative and not properly part of a statement of fact."  PRDSMF ¶ 23.  The Court agrees that the phrase "by contrast" is not a fact, and reflects a viewpoint, not a fact.  The Court strikes "by contrast."

### k.     DSMF Paragraphs 24, 25:  Qualified Responses

Bankers Life statement of material facts paragraph 24 reads:

> Valdez testified that the Bureau rejected Bankers Life's proposal to retrain and retain Mr. Knowlton as branch manager in the Bangor office.

DSMF ¶ 24.  Bankers Life's statement of material facts paragraph 25 reads:

> Mr. Valdez testified that Bankers Life initially proposed retaining Mr. Knowlton, but the Bureau made it clear in subsequent meetings that such an arrangement was unacceptable.

DSMF ¶ 25.

Mr. Knowlton interposed qualified responses, admitting that Mr. Valdez has so testified, but denying that his testimony is either accurate or credible.  PRDSMF

¶¶ 24, 25. He points to the testimony of other witnesses to support his dispute with the accuracy and credibility of Mr. Valdez's testimony. *Id.* The Court rejects the qualifications in Mr. Knowlton's responses. If Mr. Knowlton wished to posit the testimony of other witnesses to generate a triable fact, he was free to do so in his own statement of material facts. The Court deems Bankers Life's statement of material facts paragraphs 24 and 25 admitted.

**l.      DSMF Paragraphs 26, 27, 28, 29, 30:  Requests to Strike**

Bankers Life's statement of material facts paragraph 26 reads:

On February 24, 2005, Christopher Roach of the law firm of Pierce Atwood, sent a letter to Judith Shaw on behalf of Bankers Life that summarized the Bureau's concerns as expressed to Bankers Life and proposed corrective action for each of them.

DSMF ¶ 26. Bankers Life's statement of material facts paragraph 27 reads:

One of the Bureau's concerns was inadequate supervision by the two branch managers, one of whom was Mr. Knowlton: "The Bureau is concerned that some of the problems resulting in complaints stem from inadequate supervision, or lack of requiring adherence to Company policies and procedures, by branch managers."

DSMF ¶ 27. Bankers Life's statement of material facts paragraph 28 reads:

But instead of immediately terminating the branch managers, which Bankers Life could have done, Bankers Life proposed that the branch managers be retained and "placed on probation pending review of their performances and complicity in the conduct that forms the basis for the petitions now pending before the Bureau."

DSMF ¶ 28. Bankers Life's statement of material facts paragraph 29 reads:

During subsequent meetings, the Bureau made it clear to Bankers Life that it was unacceptable for the branch managers to retain their positions.

DSMF ¶ 29. Bankers Life's statement of material facts paragraph 30 reads:

As a result, Mr. Roach, on behalf of Bankers Life, sent a letter to the Bureau on March 25, 2005 that expressed the company's desire to retain the branch managers, but that also contained the language necessary to satisfy the Bureau:

<u>Maine Branch Managers</u>

We have discussed *your concerns about the Maine branch managers* with senior management of the Company. The Company's loyalty and commitment to these managers, both of whom are long-term employees, make this a very difficult decision. Prior to these petitions and complaints, both were thought of as valued and capable managers. In light of the Bureau's significant concerns, and in the interests of being able to put the Company's best foot forward and get these branches turned around, the Company will relieve both as managers and replace them as soon as possible . . . .

To that end, *and to capture the context of the Bureau's views on this issue*, we suggest the following changes to paragraph 51 of the draft consent agreement:

51.    The Bureau has investigated the complaints involving the current managers of the South Portland and Bangor branch offices and, as a result of those investigations, *no longer has the confidence that either branch can be operated in full compliance with Maine law and this consent agreement if the current management remains in place.* Accordingly, effective no later than the date of this agreement, Bankers Life shall relieve the managers of its South Portland and Bangor branch offices of their respective positions as expeditiously as possible, but with the priority of selecting individuals who are experienced enough to ensure that each branch operates in accordance with Maine law and the terms of this consent agreement.

DSMF ¶ 30 (emphasis in DSMF).

Mr. Knowlton interposed a series of similar objections to each of these proffered facts. Bankers Life cited the Roach letters, which were attached as exhibits to its statement of material facts as the record citations for paragraphs 26, 27, 28, and 30. Mr. Knowlton objected to the paragraphs since they were based on

the Roach letters. First, he said that the contents of the Roach letters to the Bureau of Insurance were hearsay, and citing two Sixth Circuit cases, he observed that inadmissible hearsay must not be considered in a motion for summary judgment. PRDSMF ¶¶ 26–28, 30. Second, he claimed the letters had not been properly authenticated under Federal Rule of Evidence 901. *Id.* Third, he asserted a contrary fact, arguing that Bankers Life could not terminate Mr. Knowlton in any event because under its policies and practice, he could not be terminated unless he failed to meet Bankers Life numbers or unless he engaged in gross misconduct. *Id.* ¶ 28. He moved to strike the "during subsequent meetings" phrase in paragraph 29 because he did not know to what meetings the phrase referred. *Id.* ¶ 29.

The Court rejects Mr. Knowlton's qualified responses and denies his requests to strike these statements. Depending on its trial context, the Roach letter is likely admissible, and for purposes of this summary judgment motion, the Court will consider it as substantive evidence. FED. R. EVID. 801(d)(1); 803(6). Regarding the authenticity contention, Rule 901 only requires that "the matter in question is what its proponent claims." FED. R. EVID. 901(a). The copies of the attached letters are on Pierce Atwood stationery, address issues in this case, and are signed by Attorney Roach. DSMF Attachs. 8, 9. The Court concludes each letter meets the Rule 901 standard. Regarding his contention that the statement is contradicted by other evidence, Mr. Knowlton's countervailing evidence is properly placed in his responsive statement of additional material facts. The Court rejects Mr. Knowlton's request to strike the phrase "during subsequent meetings" in paragraph 29, since

the period within which the meetings could have been held before his termination as manager of the Bangor office is confined and since Bankers Life's assertions can be admitted or denied without reference to a specific meeting. Finally as regards paragraph 29, the Court notes that Mr. Knowlton has denied the assertion in any event.

### m. DSMF Paragraphs 31 and 32: Requests to Strike and Qualified Responses

Bankers Life's statement of material facts paragraph 31 states:

Judith Shaw, who negotiated the consent agreement on behalf of the Bureau, testified in her affidavit that this provision was added in response to the Bureau's concerns:

Another provision in the consent agreement intended to ensure that Bankers Life would conduct itself properly in the future was that Bankers Life . . . had to relieve the managers of its South Portland and Bangor branch offices of their positions as branch managers. This provision ***was predicated on*** the Bureau's position that the substantial number and nature of complaints against Bankers Life relating to those offices represented an unacceptable level of incompetence with respect to the elderly population to which Bankers Life's products are sold, and a lack of adherence to legal requirements, and that it would be necessary for Bankers Life to take serious measures to create a new culture dedicated to the development and maintenance of a strong compliance philosophy.

DSMF ¶ 31 (emphasis in DSMF). Bankers Life's statement of material facts paragraph 32 states:

When asked about this paragraph in her deposition, Ms. Shaw once again confirmed that the Bureau's concerns prompted Mr. Knowlton's removal:

Q. It was the Bureau's position that he [Knowlton] had to be relieved from the Bangor Branch office in his position as branch manager?

22

A. The Bureau accepted Bankers Life & Casualty (sic) proposal to remove the South Portland and Bangor managers from their responsibilities as managers, yes.

Q. Well, this [paragraph 15 of Shaw affidavit] says the provision was predicated on the Bureau's position?

A. I believe Bankers Life & Casualty made that proposal based upon the Bureau's view that there was a systemic problem based upon the number and nature of the complaints that needed to be addressed.

Q. Mr. Black appears to state [in his deposition] that there was a consensus reached that the branch managers of the Bangor and South Portland office (sic) of Bankers Life & Casualty lacked the integrity and quality to perform in the positions as the branch manager. Do you agree that consensus was reached?

A. Yes.

DSMF ¶ 32.

Mr. Knowlton says that the term, "this provision," in paragraph 31 is vague and ambiguous, but in the event the Court finds paragraph 31 admissible, Mr. Knowlton qualifies his response, asserting there is evidence to the contrary. He also offers a qualified response to paragraph 32; he "admits that the Bureau's concerns prompted the Consent Agreement but denies that the Bureau had concerns about Mr. Knowlton or that those concerns prompted his removal." PRDSMF ¶ 32.

As to paragraph 31, the Court overrules the objection. "This provision" clearly refers to paragraph fifty-one of the consent agreement. The Court also refuses to accept Mr. Knowlton's qualified responses to paragraphs 31 and 32 since the qualifications are based on separate evidence that Mr. Knowlton was free to present to the Court. The Court deems paragraphs 31 and 32 admitted.

23

### n. DSMF Paragraph 34: Qualified Response

Bankers Life's statement of material facts paragraph 34 states:

Andrew Black, the Assistant Attorney General for the State of Maine, characterized the Bureau's "significant concerns" about the branch managers, including Mr. Knowlton, as follows:

The significant concerns [of the Bureau] were that there was substantial evidence to indicate that the branch managers were aware of the illegal activities that their agents were conducting. Not only were they aware but they were actually instructing them of these activities, and, you know, essentially aiding and abetting those. An additional concern was that they did not have competency, the honesty, the knowledge to act in a capacity as a responsible manager of sales agents in the State of Maine.

DSMF ¶ 34. Mr. Knowlton interposed a qualified response, noting that although he admitted that Mr. Black made the statement, he denied it was true, observing there is other evidence that does not support his statement. PRDSMF ¶ 34.

The Court refuses to accept the qualified response. If Mr. Knowlton wished to place countervailing evidence before the Court, he was free to do so in his statement of additional material facts. The Court deems paragraph 34 admitted.

### o. DSMF Paragraph 35: Qualified Response

Bankers Life's statement of material facts paragraph 35 reads:

Although Mr. Knowlton was immediately removed from his position as branch manager, Bankers Life did not terminate his contract; instead, Bankers Life continued to support him financially by placing him on a paid leave of absence.

DSMF ¶ 35. Mr. Knowlton interposed a qualified response. PRDSMF ¶ 35. He admitted that he was immediately terminated as branch manager of the Bangor branch on April 14, 2010, but says he was not placed on a paid leave of absence

until May 1, 2005. *Id.* He then asserts other facts about the length of the leave of absence and his receipt of short-term disability benefits. *Id.*

The Court refuses to accept Mr. Knowlton's qualified response. The Bankers Life statement does not mention when he started on a paid leave of absence or anything about other benefits. If Mr. Knowlton wished to present additional evidence, he was free to do so in his statement of additional material facts. The Court deems Bankers Life statement of material facts paragraph 35 admitted.

### p.   DSMF Paragraph 36:  Qualified Response

Bankers Life's statement of material facts paragraph 36 reads:

> Bankers Life also offered Mr. Knowlton an opportunity to stay with the company by becoming a unit sales manager in the Boston branch office or a unit supervisor in the Concord, New Hampshire branch office.

DSMF ¶ 36. Mr. Knowlton interposed a qualified response to this assertion. PRDSMF ¶ 36. He says that Bankers Life first offered him the position of branch manager for the North Shore office of Bankers Life but later retracted, offering him instead the position of unit sales manager. *Id.*

The Court refuses to accept Mr. Knowlton's qualified response. The statement does not discuss the timing of this offer as opposed to others, only that Bankers Life made the offer. If Mr. Knowlton wished to present countervailing facts, he was free to do so in his statement of additional material facts. The Court deems paragraph 36 admitted.

### q.   DSMF Paragraph 37: Request to Strike

Bankers Life's statement of material facts paragraph 37 reads:

Around this same time, Mr. Knowlton decided that he needed counseling, and he also began receiving short-term disability payments.

DSMF ¶ 37. Mr. Knowlton moves to strike the phrase, "[a]round this same time," as vague and ambiguous. PRDSMF ¶ 37.

The Court disagrees. As evidenced by context provided in the preceding two proffered facts, "[a]round this same time" obviously refers to the time period after Bankers Life removed him from his position as branch manager of the Bangor branch. The Court refuses to strike this introductory phrase.

### r. DSMF Paragraph 38: Qualified Response

Bankers Life's statement of material facts paragraph 38 reads:

Ultimately, Mr. Knowlton accepted the opportunity to become a unit sales manager in the Boston office, where he began work in November 2005 when his disability payments ended.

DSMF ¶ 38. Mr. Knowlton interposed a qualified response in which he seeks to add detail to the Bankers Life assertion. PRDSMF ¶ 38. The Court refuses to accept the qualified response. If Mr. Knowlton wished to place other evidence before the Court, he was free to do so in his statement of additional material facts. The Court deems paragraph 38 admitted.

### s. DSMF Paragraph 39: Qualified Response

Bankers Life's statement of material facts paragraph 39 reads:

To help provide Mr. Knowlton with a fresh start, Bankers Life took the unusual step of providing him with $9,000 per month of temporary financial support.

DSMF ¶ 39. Mr. Knowlton interposed a qualified response, saying that Bankers Life provided him with $4,500 every two weeks, and also supplying some additional

facts. PRDSMF ¶ 39. Except for the distinction between monthly and semi-monthly payments, the Court refuses to accept Mr. Knowlton's qualified response. If Mr. Knowlton wished to present additional facts, he was free to do so in his statement of additional material facts.

### t.     DSMF Paragraph 40:  Qualified Response

Bankers Life's statement of material facts paragraph 40 reads:

This financial support continued until approximately July 2006.

DSMF ¶ 40.  Mr. Knowlton interposed a qualified response, observing that the financial support continued until April and was reinstated in June after he objected. PRDSMF ¶ 40.  The Court refuses to accept the qualified response because the paragraph does not assert that the financial support was continuous to July 2006, only that it continued to July 2006.  If Mr. Knowlton wished to present additional facts, he was free to do so in his statement of additional material facts.

### u.     DSMF Paragraph 41: Request to Strike

Bankers Life's statement of material facts paragraph 41 reads:

At that time, Mr. Knowlton's financial support was ended due to his poor performance and he was placed on unpaid leave of absence.

DSMF ¶ 41.  Mr. Knowlton asked the Court to strike "[a]t that time" as vague and ambiguous.  PRDSMF ¶ 41.  The Court rejects Mr. Knowlton's request.  The phrase, "[a]t that time" obviously refers to July 2006.  However, anticipating that the Court might view the statement as referring to July 2006, Mr. Knowlton also denies it, saying that Bankers Life ceased its financial support because it had not opened a

North Shore office. He presents additional facts surrounding Bankers Life's decision not to open a North Shore office.

Mr. Knowlton's denial responds only to the middle portion of paragraph 41, discussing Bankers Life's reason for terminating the financial support. It does not address the assertion that the financial support was ended, or that Mr. Knowlton was placed on unpaid leave of absence. The Court views Mr. Knowlton's response as a qualification, not a wholesale denial. It regards as admitted that the payments stopped in July 2006 and that Mr. Knowlton was placed on unpaid leave. It accepts Mr. Knowlton's denial as to the reason Bankers Life ended the payments.

### v. DSMF Paragraph 44: Request to Strike

Bankers Life's statement of material facts paragraph 44 reads:

> Instead, he commuted to Boston from his home in Hampden, Maine on Monday and Friday of every week.

DSMF ¶ 44. Mr. Knowlton asks the Court to strike this proffered fact as argumentative and otherwise denies it, asserting that "Mr. Knowlton left his home in Maine on Monday morning and was in the Boston office of Bankers Life, Monday, Tuesday, Wednesday, and Thursday." PRDSMF ¶ 44. The Court rejects Mr. Knowlton's request; the Court does not view the fact as argumentative. The Court rejects the denial as either an admission or as nonresponsive to the proffered fact. If Mr. Knowlton left his home in Maine on Monday morning and was in the Boston office through Thursday, it seems likely he commuted back on Friday. Alternatively, if it is an attempted denial, the response that Mr. Knowlton was in

the Boston office Monday through Thursday, does not address Bankers Life's assertion that he commuted to Boston on Monday and returned to Maine on Friday.

### w. DSMF Paragraph 45: Request to Strike

Bankers Life's statement of material facts paragraph 45 reads:

> In August 2006, Bankers Life offered Mr. Knowlton an opportunity to return to work if he would agree to certain performance requirements and relocate to Massachusetts within one month.

DSMF ¶ 45. Mr. Knowlton asks that the Court strike this assertion as hearsay and as not properly authenticated. PRDSMF ¶ 45. The Court rejects Mr. Knowlton's request. Bankers Life's statement of material facts summarizes the contents of an August 11, 2006 letter from Michael Buckley of Bankers Life to Mr. Knowlton. DSMF Attach. 12. It is not hearsay under Rule 803(6) and it meets the authenticity requirements of Rule 901. FED. R. EVID. 803(6), 901.

### x. DSMF Paragraph 46: Request to Strike

Bankers Life's statement of material facts paragraph 46 reads:

> Mr. Knowlton refused, and his employment with Bankers Life was formally terminated effective March 16, 2007.

DSMF ¶ 46. Mr. Knowlton requested the Court to strike this assertion as hearsay and as not properly authenticated. PRDSMF ¶ 46. The Court rejects Mr. Knowlton's request. The assertion is based on a March 16, 2007 letter from James Valdez of Bankers Life to Mr. Knowlton. DSMF Attach. 13. It is not hearsay under Rule 803(6) and it meets the authenticity requirements of Rule 901. FED. R. EVID. 803(6); 901.

### y. DSMF Paragraph 47: Qualified Response

Bankers Life's statement of material facts paragraph 47 reads:

> Since his termination, Mr. Knowlton has received numerous job offers
> from other insurance companies, but he rejected them because he does
> not want to work as an insurance agent.

DSMF ¶ 47. Mr. Knowlton interposed a qualified response, stating a specific number of job offers he has turned down and offering a separate reason for his decisions. PRDSMF ¶ 47. The Court rejects Mr. Knowlton's qualified response since he does not deny the assertion but only wishes to add certain facts. If Mr. Knowlton wished to posit additional facts, he was free to do so in his statement of additional facts. The Court accepts the denial to the extent it disputes Bankers Life's contention that he did not want to work as an insurance agent.

### z. DSMF Paragraphs 51, 52, 53 and 54: Qualified Responses

Bankers Life's statement of material facts paragraph 51 reads:

> The statements underlying Mr. Knowlton's claims against Messrs.
> Buckley and Valdez were all purportedly made before July 2, 2007.

DSMF ¶ 51. Bankers Life's statement of material facts paragraph 52 reads:

> Mr. Knowlton has no evidence that Buckley or Valdez made or
> repeated the slanderous statement alleged in the amended complaint
> after July 2, 2007.

DSMF ¶ 52. Bankers Life's statement of material facts paragraph 53 reads:

> Mr. Knowlton alleged in the amended complaint that Mr. Buckley
> represented to him that Bankers Life had a great employment
> opportunity for him in Massachusetts.

DSMF ¶ 53. Bankers Life's statement of material facts paragraph 54 reads:

> Mr. Knowlton admitted in his deposition, however, that this statement
> was true.

DSMF ¶ 54.

Mr. Knowlton interposed qualified responses to each paragraph, noting that the consent agreement between the Bureau and Bankers Life continues to be published and that based on his past experience with Messrs. Buckley and Valdez, he "believes that Messrs. Buckley and Valdez continued to repeat the statements that he was incompetent and dishonest to other[s] after July 2007." PRDSMF ¶¶ 51–54.

The Court allows the qualified responses concerning the continuing publication of the contents of the consent agreement but rejects the qualified responses concerning Mr. Knowlton's belief about what Messrs. Buckley and Valdez may have said. The first raises the legal question of continuing publication of potential slander; the second, however, is without probative value since it essentially relies on Mr. Knowlton's understanding of the personalities of Messrs. Buckley and Valdez without any direct proof they made any such statements. Accordingly, to this extent, the qualifications in the responses are based on forbidden character evidence and are speculative. FED. R. EVID. 401, 404(a), 608.

Mr. Knowlton's qualified responses to paragraphs 53 and 54 do not appear to relate to those paragraphs and therefore the Court treats the paragraphs as admitted.

### aa. DSMF Paragraph 55: Request to Strike

Bankers Life's statement of material facts paragraph 55 reads:

The provision on which Mr. Knowlton relies to support his breach of contract claim is found on page one of the Contract:

5.    REPRESENTATIONS AND WARRANTIES

Manager represents and warrants to the Company as follows:
....
(b)    The Manager agrees to abide by all policies, practices and procedures adopted by the Company.

DSMF ¶ 55.  Mr. Knowlton requested the Court to strike this assertion on the ground that it failed to contain the requisite record citation for the proposition "the provision on which Mr. Knowlton relies."  PRDSMF ¶ 55.  The Court sustains the motion to strike in part, altering the introductory phrase to "one of the provisions on which Mr. Knowlton relies."

### bb.    DSMF Paragraph 56: Qualified Response

Bankers Life's statement of material facts paragraph 56 reads:

The Contract further provides as follows:

**26. ENTIRE CONTRACT**
This Contract, including the Branch Sales Manager's Compensation Schedule and any Endorsements, supersedes and terminates all previous Contracts, any oral representations or understanding and constitutes the entire Contract between the parties.  This Contract can only be changed or modified by written consent, signed on behalf of the Company by the Senior Vice President of Marketing, President or Chief Executive Officer of the Company.

DSMF ¶ 56.  Mr. Knowlton interposed a qualified objection, stating that this provision is not controlling under Illinois or Maine law.  The Court refuses to accept Mr. Knowlton's qualified response since it amounts to a legal argument and does not address the factual accuracy of the assertion.

### cc.    DSMF Paragraph 57: Qualified Response

Bankers Life's statement of material facts paragraph 57 reads:

The Bankers Life Defendants all testified that they believed the Bureau required Bankers Life to relieve Mr. Knowlton of his duties as branch manager.

DSMF ¶ 57. Mr. Knowlton interposed a qualified response, observing that even though each of the Bankers Life employees so testified, there is additional evidence on this point. PRDSMF ¶ 57. If Mr. Knowlton wished to posit additional facts, he was free to do so in his statement of additional material facts. The Court treats this paragraph as admitted.

### dd. DSMF Paragraph 58: Qualified Response

Bankers Life's statement of material facts paragraph 58 reads:

Mr. Knowlton's pay actually *increased* when he began working in the Boston office.

DSMF ¶ 58 (emphasis in DSMF). Mr. Knowlton interposed a qualified response, acknowledging that he received compensation, to cover his travel, meals, lodging and salary when he began working in Boston in excess of his base pay, but when his travel, meals, and lodging were backed out of the compensation, his pay did not increase when he began working in Boston. PRDSMF ¶ 58. The Court allows Mr. Knowlton's qualified response to stand since it directly addressed and properly qualifies Bankers Life's paragraph 58.

### 4. The Plaintiff's Statement of Additional Material Facts and the Defendant's Requests to Strike and Objections

The Rule 56 analysis of Bankers Life's responses to Mr. Knowlton's statement of additional material facts allows a simpler approach. The familiar directive to view the facts in the light most favorable to the non-movant consistent with record support means that unless the record does not support Mr. Knowlton's

statement, the Court must accept it for purposes of ruling on the pending motion.
*See Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).  Thus,
unless a qualified response challenges the legitimacy of the statement itself, the
Court has restricted its rulings to Bankers Life's legal objections.

### a.    PASMF Paragraph 63:  Request to Strike

Mr. Knowlton's statement of additional material facts paragraph 63 reads:

During the 20 years in which Alan Knowlton managed the Bangor
office of Bankers Life, he was repeatedly advised by Senior Level
Management of Bankers Life that:

1) "It's your office;"
2) "It's an opportunity to build your own business;"
3) "The Branch Sales Manager is an entrepreneurial opportunity for
   you;"
4) "Take personal ownership of your office;"
5) "Run your office as you see fit;"
6) "Spend your budget as you see fit, it's your office."

PSAMF ¶ 63.  Bankers Life asked that the paragraph be stricken due to lack of
specificity since it fails to identify who within senior management made the
statements.  DRPSAMF ¶ 63.  The Court rejects Bankers Life's request.  Based on
Mr. Knowlton's affidavit, PSAMF Attach 1 ¶ 7, he has established a barely
sufficient foundation.

### b.    PSAMF Paragraphs 65, 66 and 67:  Requests to Strike

Mr. Knowlton's statement of additional material facts paragraph 65 reads:

During the twenty plus years that Alan Knowlton worked for Bankers
Life, he knew several individuals who had spent their entire careers as
Branch Sales Managers with Bankers Life before retiring.

PSAMF ¶ 65. Mr. Knowlton's statement of additional material facts paragraph 66 reads:

> During the twenty years that Mr. Knowlton ran the Bangor office of Bankers Life, he earned numerous awards for the Bangor office's performance and the quality of business the office produced.

PSAMF ¶ 66. Mr. Knowlton's statement of additional material facts paragraph 67 reads:

> Alan Knowlton's compensation and benefit plan included:
>
> Benefits
>
> a) Group Major Medical Coverage;
> b) Group Dental Coverage;
> c) Supplemental Life and Accidental Death and Dismemberment;
> d) Supplemental Long Term Disability (20%);
> e) Short Term Disability;
> f) Company Paid Term Life;
> g) Company Paid Accidental Death and Dismemberment;
> h) Company Paid Long Term Disability (40%);
> i) Employee Assistance Plan;
> j) Conseco Save 401K (3% company match);
> k) Man[a]gers Deferred Compensation Plan;
> l) Agents Deferred Compensation Plan.
>
> Managers Compensation
>
> a) Branch Sales Manager Basic Salary;
> b) Branch Sales Manager Over Write Commission;
> c) Conservation Commission Bonus;
> d) New Agent Incentive Bonuses;
> e) Agent Productivity Bonuses;
> f) Agent Recruiting Bonuses;
> g) Branch Sales Manager Expense Allowance.
>
> Manager Financial Involvement and Authority
>
> a) New Agent Development Program—Financing Plan for new Agents, Branch Sales Manager pays $50 for new hire;

b) Branch Development Expense Allowance—Branch Sales Manager pays 4% of income to support;
c) Branch Prospecting Account;
d) Branch Sales Man[a]ger's Revenue and Expense Component;
e) Agent Emeritus Program.

PSAMF ¶ 67.

Bankers Life asked that the facts be stricken because they are neither relevant nor material. DRPSAMF ¶¶ 65–67. The Court denies Bankers Life's requests. The Court agrees that the facts are neither relevant nor material to Bankers Life's theory of the case, but concludes they are relevant and material to Mr. Knowlton's theory of the case. As Bankers Life failed otherwise to respond, the Court deems the facts admitted.

### c. PSAMF Paragraphs 68, 69: Requests to Strike

Mr. Knowlton's statement of additional material facts paragraph 68 reads:

The purpose of the benefit and compensation programs provided by Bankers Life [was] to provide employees with the expectation and security that if they performed their duties faithfully and honestly, they could expect to retire from Bankers Life.

PSAMF ¶ 68. Mr. Knowlton's statement of additional material facts paragraph 69 reads:

Bankers Life Employee Retirement Plan and Managers Deferred Compensation Plan were structured to promote Branch Service Managers to stay with the company until they retired.

PSAMF ¶ 69. Bankers Life requested that these facts be stricken because Mr. Knowlton, whose affidavit is the sole record citation in support of these assertions, has no personal knowledge of the reasoning behind Bankers Life's compensation structure. DRPSAMF ¶¶ 68, 69. The Court rejects Bankers Life's request. Mr.

Knowlton had worked for Bankers Life for nearly twenty-seven years, nearly twenty-two of which were as a branch manager. Mr. Knowlton has a sufficient personal familiarity with Bankers Life to express his view as to the purpose of its compensation structure.

Bankers Life also objects to both facts on the ground that they are neither relevant nor material. *Id.* The Court denies Bankers Life's request. The Court agrees that the facts are neither relevant nor material to Bankers Life's theory of the case, but concludes they are relevant and material to Mr. Knowlton's theory of the case.

### d. PSAMF Paragraph 70: Request to Strike

Mr. Knowlton's statement of additional fact paragraph 70 reads:

> Bankers Life had policies, which encouraged Branch Sales Managers to stay with Bankers Life until they retired.

PSAMF ¶ 70. Bankers Life requested that this fact be stricken because it is neither relevant nor material. DRPSAMF ¶ 70. The Court rejects Bankers Life's request. The Court agrees that the fact is neither relevant nor material to Bankers Life's theory of the case, but concludes it is relevant and material to Mr. Knowlton's theory of the case.

### e. PSAMF Paragraphs 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 85, 86, 87, 88, 89, 117, 118, 129: Requests to Strike

Mr. Knowlton's statement of additional material facts paragraph 73 reads:

> In or around 2001 Van Sullivan within the Market Conduct Division of the Maine Bureau of Insurance under the auspices of Deputy Superintendent, Eric Ciopa, began conducting an investigation into the market conduct practices of Bankers, with a specific focus on certain sales practices which targeted elderly consumers.

PSAMF ¶ 73. Mr. Knowlton's statement of additional material facts paragraphs 74, 75, 76, 77, 78, 79, 80, 81, 82, 85, 86, 87, 88, 89 and 129 contain similar assertions about the Bureau of Insurance investigation of Bankers Life. PSAMF ¶¶ 74–82, 85–89, 129.

Bankers Life requested that each of these facts be stricken because they are not based on Mr. Knowlton's personal knowledge, and to the extent he gained personal knowledge, it was obtained by inadmissible hearsay. DRPSAMF ¶¶ 73–82, 85–89, 129. Further, Bankers Life contends the facts are neither relevant nor material. *Id.*

The Court denies Bankers Life's requests to strike. The Court agrees with Bankers Life that the way Mr. Knowlton elected to present these facts—namely, through his own affidavit, rather than through the testimony of a Bureau of Insurance or Bankers Life employee—presents a potentially serious foundational problem for admissibility, particularly at trial. Mr. Knowlton does not reveal how he knows what the Bankers Life and Bureau employees discussed. Nevertheless, the Court will not assume for purposes of this motion that Mr. Knowlton does not know or could not testify to what he set forth in his affidavit.

The hearsay objection is less compelling. Most of the facts are not being offered for the truth but to explain the Bureau of Insurance's and Bankers Life's motivations leading to his termination as Bangor branch office manager. In fact, Mr. Knowlton disagrees vehemently with the conclusions of incompetence and dishonesty that the Bureau apparently reached and he also pointedly disputes

Bankers Life's current descriptions of its reluctant acquiescence to Bureau pressure. Accordingly, only for purposes of the motion for summary judgment, the Court accepts these additional material facts.

Regarding Bankers Life's relevancy and materiality objections, the Court agrees that the facts are neither relevant nor material to Bankers Life's theory of the case, but concludes they are relevant and material to Mr. Knowlton's theory of the case.

### f.     PSAMF Paragraph 93: Qualified Response

Mr. Knowlton's statement of additional material facts paragraph 93 reads:

> James Valdez, Michael Buckley, and Bruce Jordan all repeatedly represented to Alan Knowlton that the Bureau required his termination as a condition of the April 11, 2005 Consent Agreement.

PSAMF ¶ 93. Bankers Life interposed a qualified response, saying that the term "repeatedly" is vague. DRPSAMF ¶ 93. The Court refuses to accept this qualification. Whenever three people all say the same thing, the thing has been said repeatedly.

### g.     PSAMF Paragraph 94: Qualified Response

Mr. Knowlton's statement of additional material facts paragraph 94 reads:

> Mr. Knowlton was not given notice, nor an opportunity to be heard before he was terminated as the Branch Manager of the Bangor office of Bankers Life.

PSAMF ¶ 94. Bankers Life interposed a qualified response on the ground that the "statement is vague." DRPSAMF ¶ 94. The Court refuses to accept Bankers Life's qualified response. The fact is deemed admitted.

### h.     PSAMF Paragraph 95:  Request to Strike

Mr. Knowlton's statement of additional material facts paragraph 95 reads:

In 2005 James Valdez, Michael Buckley, and Bruce Jordan were agents of Bankers Life in all of their dealings with Alan Knowlton.

PSAMF ¶ 95. Bankers Life requested that this assertion be stricken because it constitutes a legal conclusion. DRPSAMF ¶ 95. The Court rejects Bankers Life's request. Agency contains both factual and legal elements. As Bankers Life did not otherwise respond, the Court accepts Bankers Life's response as admitting the facts underlying agency but not the legal conclusion of agency.

Furthermore, the Court wonders whether Bankers Life is making this objection for the sake of making an objection. In Bankers Life's attachments to its statement of material facts, it attached the deposition transcripts of James Valdez, Michael Buckley, and Bruce Jordan and in each of the transcripts, each admits he is a Bankers Life's management employee and was so employed during the relevant time period. DSMF Attach. 7 at 5:11–6:8 (*Dep. of James Valdez*); DSMF Attach. 2 at 5:17–6:5 (*Dep. of Michael Buckley*); DSMF Attach. 11 at 5:11–7:9 (*Dep. of Bruce Jordan*).

### i. PSAMF Paragraphs 103, 104, 106 and 107: Requests to Strike

Mr. Knowlton's statement of additional material facts paragraph 103 reads:

On December 15, 2005, Alan Knowlton responded to an advertisement run in the December 11, 2005 weekend edition of the Bangor Daily News. The advertisement stated that an "Insurance Professional Wanted for Branch Manager Position." He called and left a message that he was interested in the position.

PSAMF ¶ 103. Mr. Knowlton posited a number of similar assertions relating to his conversations about a potential position as state of Maine branch manager with

Combined Insurance and his decision not to accept the job offer. PSAMF ¶¶ 104, 106, 107. Bankers Life requested that each of these assertions be stricken as inadmissible hearsay. DRPSAMF ¶¶ 103, 104, 106, 107. Some are clearly not hearsay. For example, Mr. Moorehead's statement that he was in the airport and could not speak in detail is not offered for the truth. *See* PSAMF ¶ 104. To the extent that the statements of third parties are hearsay and are submitted for the truth, the Court sustains the objection; to the extent the statements are not for the truth but to provide context for Mr. Knowlton's personal knowledge, the Court rejects the objection. The essence of these statements, however, is that Mr. Knowlton received a job offer from Combined Insurance, and on this point, the Court accepts the facts since they fall within Mr. Knowlton's personal knowledge and are not hearsay.

### j. PSAMF Paragraphs 112 and 113: Requests to Strike

Alan Knowlton's statement of additional material facts paragraph 112 reads:

> Bankers Life never raised the issue of poor performance with Mr. Knowlton. In July 2006 the only conversations between Bankers Life and Alan Knowlton surrounded his complaints to management that he had been treated poorly as a result of the Maine Consent Agreement, and the fact that he had not yet moved to Massachusetts. Part of the reason Mr. Knowlton had not yet moved was he was still in treatment for depression and anxiety in Maine.

PSAMF ¶ 112. His statement of material facts paragraph 113 reads:

> On June 27, 2006, James Valdez represented to Alan Knowlton's Counsel that he was not competent to be a Branch manager stating, "Quite to the contrary, the investigation by the Maine Bureau of Insurance led the Bureau to conclude that Mr. Knowlton was not competent to manage the Bangor office, nor remain in any management capacity in any Maine branch operated by Bankers Life and Casualty Company."

PSAMF ¶ 113.   In addition to denying and qualifying the respective facts, Bankers Life requested that the facts be struck as neither relevant nor material.  DRPSAMF ¶¶ 112, 113.  The Court rejects the request.  The Court agrees that the facts are neither relevant nor material to Bankers Life's theory of the case, but concludes they are relevant and material to Mr. Knowlton's theory of the case.

### k.    PSAMF Paragraph 114:  Request to Strike

Alan Knowlton's statement of additional material facts paragraph 114 reads:

James Valdez statement disparaged Alan Knowlton's character by suggesting that he was incompetent and dishonest in his business dealings.

PSAMF ¶ 114.   Bankers Life requested that this paragraph be stricken on the ground that it is a legal conclusion and neither relevant nor material.  DRPSAMF ¶ 114.  The Court rejects Bankers Life's request and treats the paragraph solely as matters of fact, not law.  Further, while the Court agrees that the fact is neither relevant nor material to Bankers Life's theory of the case, it concludes it is relevant and material to Mr. Knowlton's theory of the case.

### l.    PSAMF Paragraphs 115 and 116:  Requests to Strike

Alan Knowlton's statement of additional material facts paragraph 115 reads:

On July 7, 2006, Michael Buckley again told Alan Knowlton that the State of Maine Bureau of Insurance required that he be replaced as a Branch Sales Manager.

PSAMF ¶ 115.   Mr. Knowlton's statement of additional material facts paragraph 116 reads:

On July 7, 2006, Michael Buckley told Mr. Knowlton that the Bureau found he was incompetent to be a Branch Sales Manager in Maine.

PSAMF ¶ 116.  Bankers Life requested that the facts be stricken on the ground that they are neither relevant nor material.  DRPSAMF ¶¶ 115, 116.  The Court rejects the request.  The Court agrees that the facts are neither relevant nor material to Bankers Life's theory of the case, but concludes they are relevant and material to Mr. Knowlton's theory of the case.

### m.    PSAMF Paragraphs 121 and 122:  Requests to Strike

Mr. Knowlton's statement of additional material facts paragraph 121 states:

> Bankers Life contracted with Alan Knowlton to be Branch Sales manager of the Bangor office of Bankers Life until his retirement provided he performed his duties faithfully and honestly.

PSAMF ¶ 121.  Mr. Knowlton's statement of additional material facts paragraph 122 reads:

> Bankers Life breached its agreement with Alan Knowlton by constructively discharging him from his employment with Bankers Life on or about April 14, 2005.

PSAMF ¶ 122.  Bankers Life requested that the paragraphs be stricken because they state legal conclusions, not facts.  DRPSAMF ¶¶ 121, 122.  The Court agrees and strikes the two material facts.

### n.    PSAMF Paragraph 123: Request to Strike

Mr. Knowlton's statement of additional material facts paragraph 123 states:

> The contract between Alan Knowlton and Bankers Life and Casualty Co. contained a covenant of good faith and fair dealing.

PSAMF ¶ 123.  Banker Life requested that this paragraph be stricken because it states a legal conclusion.  DRPSAMF ¶ 123.  The Court agrees and strikes this paragraph.  Mr. Knowlton does not cite a provision of the contract itself as support;

instead, he cites his own affidavit. The Court draws the conclusion that the contract does not contain such a provision but that Mr. Barker believes it should be implied as a matter of law. Whether it should be is not a matter of personal opinion but of law.

### o. PSAMF Paragraphs 127, 128, 130: Requests to Strike

Mr. Knowlton's statement of additional material facts paragraph 127 reads:

> Alan Knowlton relied upon the promises made by Bankers Life to his detriment.

PSAMF ¶ 127. Mr. Knowlton's statement of additional material facts paragraph 128 reads:

> Bankers Life has failed to honor the promises it made to Alan Knowlton.

PSAMF ¶ 128. Mr. Knowlton's statement of additional material facts 130 reads:

> When Alan Knowlton learned that Bankers had made representations to him that were untrue, he brought an action against them. That action is premised on the facts of the case, the terms of the contract, the policies, procedures, and practices of Bankers Life and Mr. Knowlton's understanding of his rights under Maine and Illinois law.

PSAMF ¶ 130. Bankers Life requested that these paragraphs be stricken on the ground that they are legal conclusions. As regards paragraphs 127 and 128, the Court rejects Bankers Life's requests and treats the assertions solely as matters of fact, not law. As regards paragraph 130, the Court agrees and strikes paragraph 130.[4]

---

[4] In Bankers Life's reply to Mr. Knowlton's statement of additional material facts, it posited a reply statement of material fact. DRPSAMF ¶¶ 131–36. Under Local Rule 56(d), Bankers Life's reply to Mr. Knowlton's opposition to its statement of material facts "shall be limited to any additional facts submitted by the opposing party." D. ME. LOC. R. 56(d). The parties have amassed a grand total of

### E.    The Refined Statement of Facts

After resolving the parties' multiple objections, viewing the evidence in the light most favorable to Mr. Knowlton, the following facts emerge:

Bankers Life hired Alan Knowlton as a Sales Agent in November 1980 in the Concord, New Hampshire office.  PSAMF ¶ 59; DRPSAMF ¶ 59.  In May 1985, Bankers Life promoted Mr. Knowlton to the position of Branch Sales Manager for its Bangor, Maine office.  PSAMF ¶ 60; DRPSAMF ¶ 60.  In his position as Branch Sales Manager, Mr. Knowlton was responsible for recruiting, training, and developing career agents, sales managers, and administrative staff as well as monitoring and supervising the functions of agents, managers, and staff.  PSAMF ¶ 61; DRPSAMF ¶ 61.  During Mr. Knowlton's term as Branch Sales Manager, the Bangor office of Bankers Life grew from three to twenty-five to thirty agents and from a Bankers Life ranking of 219 out of 225 offices to one of its top fifty branch offices.  PSAMF ¶ 62; DRPSAMF ¶ 62.

On January 1, 1995, and again in January 2006, Mr. Knowlton entered into written branch sales manager employment contracts with Bankers Life.  DSMF ¶¶ 7–8; PRDSMF ¶¶ 7–8.  Both contracts contain substantially the same provisions; however, the January 1, 1995 employment contract governs this lawsuit.  DSMF ¶¶ 9–10; PRDSMF ¶¶ 9–10.  The January 1, 1995 contract provides that "[e]ither party may terminate this Contract at will, without cause, by giving written notice to the other party."  DSMF ¶ 11; PRDSMF ¶ 11.  The contract further provides that it

---

130 separate material facts, and the Court has not considered the reply statement of material facts on the ground that the reply violates the local rule and on the premise that by the time of the reply, everything that should have been said, has been said.

"supersedes and terminates all previous Contracts, any oral representations or understandings and constitutes the entire Contract between the parties." DSMF ¶ 13; PRDSMF ¶ 13. The contract also provides that it could only be "changed or modified by written consent signed on behalf of the Company." DSMF ¶ 14; PRDSMF ¶ 14.

During the twenty years he served as the Bangor office Branch Sales Manager, senior level management at Bankers Life told Mr. Knowlton: "It's your office," "It's an opportunity to build your own business," "The Branch Sales Manager is an entrepreneurial opportunity for you," "Take personal ownership of your office," "Run your office as you see fit," and "Spend your budget as you see fit, it's your office." PSAMF ¶ 63; DRPAMF ¶ 63. All of these statements led Mr. Knowlton to believe that his position and career were secure as long as he continued to honestly and faithfully perform his work, and based on these statements, he understood that he had a contract for continued employment for as long as he wanted to work with Bankers Life. PSAMF ¶ 64; DRPAMF ¶ 64. During his twenty years at Bankers Life, Mr. Knowlton knew several individuals who had spent their entire careers as Branch Sales Managers at Bankers Life before retiring. PSAMF ¶ 65; DRPSAMF ¶ 65. During his time at Bankers Life, Mr. Knowlton earned numerous awards for the Bangor office's performance and the quality of the business it produced. PSAMF ¶ 66; DRPSAMF ¶ 66.

Mr. Knowlton's compensation and benefit plans at Bankers Life included:

Benefits

a) Group Major Medical Coverage;
b) Group Dental Coverage;
c) Supplemental Life and Accidental Death and Dismemberment;
d) Supplemental Long Term Disability (20%);
e) Short Term Disability;
f) Company Paid Term Life;
g) Company Paid Accidental Death and Dismemberment;
h) Company Paid Long Term Disability (40%);
i) Employee Assistance Plan;
j) Conseco Save 401K (3% company match);
k) Man[a]gers Deferred Compensation Plan;
l) Agents Deferred Compensation Plan.

Managers Compensation

a) Branch Sales Manager Basic Salary;
b) Branch Sales Manager Over Write Commission;
c) Conservation Commission Bonus;
d) New Agent Incentive Bonuses;
e) Agent Productivity Bonuses;
f) Agent Recruiting Bonuses;
g) Branch Sales Manager Expense Allowance.

Manager Financial Involvement and Authority

a) New Agent Development Program—Financing Plan for new Agents, Branch Sales Manager pays $50 for new hire;
b) Branch Development Expense Allowance—Branch Sales Manager pays 4% of income to support;
c) Branch Prospecting Account;
d) Branch Sales Man[a]ger's Revenue and Expense Component;
e) Agent Emeritus Program.

PSAMF ¶ 67; DRPSAMF ¶ 67. The purpose of Bankers Life's benefit and compensation programs was to provide employees with the expectation and security that if they performed their duties faithfully and honestly, they could expect to retire from Bankers Life. PSAMF ¶ 68; DRPSAMF ¶ 68. More specifically, the Bankers Life policies, Employee Retirement Plan and Managers Deferred Compensation Plan were structured to encourage Branch Service Managers to stay

with Bankers Life until they retired. PSAMF ¶¶ 69, 70; DRPSAMF ¶¶ 69, 70. Furthermore, Mr. Knowlton understood from repeated conversations with Leroy Kunselman and Bruce Jordan that Bankers Life had a policy or practice only to terminate its branch sales managers for lack of performance or proven wrongdoing. PSAMF ¶ 71; DRPSAMF ¶ 71. Based on the benefit and compensation plan, the policies, procedures, and actions of Bankers Life, Mr. Knowlton understood that he had a guarantee of continued employment until he retired, provided he performed his duties adequately, honestly, and diligently. PSAMF ¶ 72; DRPSAMF ¶ 72.

In 2001, Mr. Van Sullivan, an employee within the Market Conduct Division of the Maine Bureau of Insurance, under the auspices of Deputy Superintendent Eric Ciopa, began an investigation into the marketing practices of Bankers Life with a specific focus on sales practices that targeted elderly consumers. PSAMF ¶ 73; DRPSAMF ¶ 73. The investigation revealed significant violations in the Bankers Life South Portland branch office. PSAMF ¶¶ 73–74; DRPSAMF ¶¶ 73–74. The investigation did not, however, reveal any evidence of significant violations in the Bangor branch office of Bankers Life. PSAMF ¶ 75; DRPSAMF ¶ 75. The Van Sullivan investigation was turned over to Judith Shaw, the Bureau's Deputy Superintendent, in 2002; however, Deputy Shaw, Assistant Attorney General Andrew Black, and Director of Consumer Healthcare for the Bureau, Glenn Griswold, never reviewed the results of the Van Sullivan report. PSAMF ¶¶ 80–81; DRPSAMF ¶¶ 80–81.

In 2002, after learning about a number of complaints against Bankers Life, Deputy Shaw instructed Director Griswold to assign investigators to determine whether Bankers Life was engaging in systemic improper sales practices. PSAMF ¶ 77; DRPSAMF ¶ 77. Mr. Griswold assigned Mike McGonigle and Linda Dion to conduct the investigation. PSAMF ¶ 78; DRPSAMF ¶ 78. Neither Mike McGonigle nor Linda Dion could identify any management or other practices that Mr. Knowlton engaged in that led to any systemic improper sales actions in the Bangor office of Bankers Life. PSAMF ¶ 79; DRPSAMF ¶ 79.

On April 5, 2005, the Bureau—through Deputy Shaw and Director Griswold—entered into a Consent Agreement with Mr. Knowlton and the Maine Office of the Attorney General, through Andrew Black. PSAMF ¶ 83; DRPSAMF ¶ 83. The Consent Agreement with Mr. Knowlton provided that the Bureau and the Office of Attorney General agreed "to forego pursuing further disciplinary measures or other civil or administrative sanctions against Mr. Knowlton for violations described in the Stipulations, other than those agreed to in this Consent Agreement." PSAMF ¶ 84; DRPSAMF ¶ 84. While promising Mr. Knowlton that no further civil or administrative sanctions would be taken against him, Deputy Shaw, Director Griswold, and Attorney Black were negotiating his termination with Bankers Life. PSAMF ¶ 85; DRPSAMF ¶ 85.

Between January 1, 2002 and April 11, 2005, the Bureau of Insurance received 70 formal complaints alleging violations of the Maine Insurance Code by agents appointed by Bankers Life, including agents recruited, trained, and

supervised by Mr. Knowlton in the Bangor branch office. DSMF ¶ 16; PRDSMF ¶ 16. Based on these complaints, the Bureau reached the following conclusion:

> It is the position of the Bureau of Insurance that the substantial number and nature of consumer complaints received by the Bureau related to Bankers Life and its Maine producers, branch and unit managers, represents an unacceptable level of incompetence with respect to the elderly population to which Bankers Life's products are sold, and a lack of adherence to legal requirements; therefore, neither the South Portland nor Bangor branch can be operated in full compliance with Maine law and this Consent Agreement as those branches are currently operated. As such, it is necessary for Bankers Life to take serious measures to create a new culture dedicated to the development and maintenance of a strong compliance philosophy.

DSMF ¶ 17; PRDSMF ¶ 17. To address this situation, the Bureau and Bankers Life entered into a Consent Agreement on April 11, 2005. DSMF ¶ 18; PRDSMF ¶ 18. Among other provisions, the Consent Agreement required that "Bankers Life shall relieve the managers of its South Portland and Bangor branch offices of their positions as branch managers" and that, until these staffing changes were made, Bankers Life would "suspend the sale of all deferred annuity products in the State of Maine." DSMF ¶¶ 19, 20; PRDSMF ¶¶ 19, 20. Deputy Shaw testified that the removal of the branch managers "was predicated on the Bureau's position" that the two branch offices were not being competently managed and that Bankers Life was required to take "serious measures" to change the culture in those offices. DSMF ¶ 21; PRDSMF ¶ 21.

Although there is contradictory evidence as to whether Bankers Life attempted to convince the Bureau to allow it to retain Mr. Knowlton as Bangor Branch Sales Manager, the Court recites the evidence in the light most favorable to

Mr. Knowlton. Mr. Knowlton says that as part of the negotiations that led to the April 11, 2005 Consent Agreement, the Bureau originally proposed that Bankers Life agree to an audit of the managers' practices in the Bangor and South Portland offices, a process that would have allowed Mr. Knowlton to defend himself. PSAMF ¶¶ 87, 129; DRPSAMF ¶¶ 87, 129. In response, Bankers Life asked the Bureau to insert language in the Consent Agreement that confirmed that the Bureau had investigated the complaints involving the South Portland and Bangor branch managers, but the Bureau refused to do so because it had not performed such an investigation. PSAMF ¶¶ 88–89; DRPSAMF ¶¶ 88–89. At that point, Mr. Knowlton says it was Bankers Life that proposed to remove Mr. Knowlton from his job as Bangor Branch Sales Manager. PSAMF ¶ 129; DRPSAMF ¶ 129. Mr. Knowlton believes that Bankers Life proposed removing him from his job in order to prevent the Bureau from investigating Neal Quimby, one of Bankers Life's top producers. PSAMF ¶ 124; DRPSAMF ¶ 124. Bankers Life President, Scott Perry, and Vice-President, John Scheils, agreed with the state of Maine that Mr. Knowlton could no longer be a branch sales manager in a state other than Maine because Bankers Life would lose credibility. PSAMF ¶ 118; DRPSAMF ¶ 118.

After Bankers Life entered into the April 11, 2005 Consent Agreement, it approached Mr. Knowlton on April 14, 2005. The Bankers Life supervisors told Mr. Knowlton that the Bureau had insisted upon his removal as Bangor Branch Sales Manager and that Bankers Life had fought with the Bureau to preserve his position since they knew that he was not at fault. PSAMF ¶¶ 96–99; DRPSAMF ¶¶ 96–99.

They assured him that Bankers Life would take care of him. PSAMF ¶ 99; DRPSAMF ¶ 99. Even so, the Bankers Life supervisors told him that the Bureau had insisted that he no longer serve as a branch manager not only in Maine but anywhere else in the United States. PSAMF ¶¶ 101, 102; DRPSAMF ¶¶ 101, 102. Mr. Knowlton later learned that these representations were untrue. PSAMF ¶ 130; DRPSAMF ¶ 130.

After Bankers Life removed Mr. Knowlton from the position of Bangor Branch Manager, it placed Mr. Knowlton on short-term disability. DSMF ¶ 37; PRDSMF ¶ 37. Mr. Knowlton continued to receive short-term disability until November 2005, when he began to work as a unit sales manager in the Bankers Life Boston office. DSMF ¶ 38; PRDSMF ¶ 38. However, Bankers Life continued to pay Mr. Knowlton $4,500 every other week until July 2006. DSMF ¶¶ 39–40; PRDSMF ¶¶ 39–40.

On July 1, 2005, Bankers Life told Mr. Knowlton that it had a great opportunity for him in Massachusetts to build a branch sales office on the North Shore. PSAMF ¶ 100; DRPSAMF ¶ 100. They told him that he would have to start as a unit sales manager at the Bankers Life Boston office as it would take a little time to set up the North Shore office. PSAMF ¶ 109; DRPSAMF ¶ 109. Mr. Knowlton relied on these representations and believing his move to Branch Manager of the North Shore office was imminent, he accepted the demotion to be Unit Sales Manager on a temporary basis. PSAMF ¶ 109; DRPSAMF ¶ 109.

On December 15, 2005, after Mr. Knowlton began work in Boston for Bankers Life, he responded to an advertisement for a branch manager position for an insurance company. PSAMF ¶ 103; DRPSAMF ¶ 103. On December 16, 2005, Mike Moorehead of Combined Insurance ("Combined") contacted Mr. Knowlton and told him that someone from Combined would be in touch with him. PSAMF ¶ 104; DRPSAMF ¶ 104. On January 4, 2006, John Morrison of Combined interviewed Mr. Knowlton for the position of Branch Manager for Combined's Maine offices. PSAMF ¶ 105; DRPSAMF ¶ 105. On January 23, 2006, Mr. Morrison and Kay (Mr. Morrison's boss) met with Mr. Knowlton and offered him the position of Territorial Manager for Combined. PSAMF ¶ 107; DRPSAMF ¶ 107. Mr. Knowlton rejected Combined's offer because he felt personal loyalty to Bankers Life based on its prior representations that it had fought for him with the Bureau of Insurance and based on its promise to make him the Branch Office Manager for its North Shore Branch. PSAMF ¶ 108; DRPSAMF ¶ 108.

During his time as Unit Sales Manager in Boston, Mr. Knowlton recruited a number of new agents, was assigned to train them, and although he sold numerous policies, he gave all his sales to the agents in an attempt to retain them. PSAMF ¶ 111; DRPSAMF ¶ 111. Bankers Life did not raise any issues with his job performance in Boston. PSAMF ¶ 112; DRPSAMF ¶ 112. Mr. Knowlton continued to live in Hampden, Maine during this time. DSMF ¶¶ 43–44; PRDSMF ¶¶ 43–44. In June and July 2006, James Valdez and Michael Buckley disparaged Mr. Knowlton, stating that he was not competent to be a branch manager, suggesting

that he was incompetent and dishonest, and asserting that he had engaged in improper and dishonest sales practices. PSAMF ¶¶ 113–18; DRPSAMF ¶¶ 113–18. By July 2006, Bankers Life had not opened the branch office on the North Shore. PSAMF ¶ 110; DRPSAMF ¶ 110. In July 2006, Bankers Life ended its financial support of Mr. Knowlton and in August 2006, it offered Mr. Knowlton the opportunity to return to work if he would agree to certain performance requirements and relocate to Massachusetts within one month. DSMF ¶ 45; PRDSMF ¶ 45. Mr. Knowlton refused and Bankers Life terminated his employment effective March 16, 2007. DSMF ¶ 46; PRDSMF ¶ 46.

## II.    DISCUSSION

### A.    The Summary Judgment Standard[5]

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995); *accord Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006); *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218–19 (1st Cir. 2004). An

---

[5] On December 1, 2010, while these motions were pending, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. *See Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 n.4 (1st Cir. 2011). Applying the amended version of Rule 56 to this case is "just and practicable" and would not "work a manifest injustice" because the amendments "do not change the summary judgment standard or burdens." *Id. See also Tropigas de Puerto Rico, Inc. v. Certain Underwriters At Lloyds Of London*, 637 F.3d 53, 56 n.5 (1st Cir. 2011) (stating that "[t]he substantive standard for summary judgment remains unchanged"); *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 n.4 (1st Cir. 2011) (same); *Del Toro Pacheco v. Pereira*, 633 F.3d 57, 62 n.6 (1st Cir. 2011) (same); *Hartford Fire Ins. Co. v. CAN Ins. Co. (Eur.)*, 633 F.3d 50, 54 n.6 (1st Cir. 2011) (same).

issue is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *McCarthy*, 56 F.3d at 315 (quoting *United States v. One Parcel of Real Prop. with Bldgs., Appurtenances, and Improvements, Known As Plat 20, Lot 17, Great Harbor Neck, New Shoreham, Rhode Island*, 960 F.2d 200, 204 (1st Cir. 1992)); *accord Seaboard Sur. Co.*, 370 F.3d at 218–19. Once this evidence is supplied by the moving party, the nonmovant "must point to 'competent evidence' and 'specific facts' to stave off summary judgment." *Tropigas de Puerto Rico, Inc.*, 637 F.3d at 56; *accord ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002).

The Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas de Puerto Rico, Inc.*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009); *Carroll v. Xerox Corp.*, 294 F.3d 231, 236–37 (1st Cir. 2002). Rather, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll*, 294 F.3d at 237 (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd.*, 632 F.3d at 35; *accord Merchs. Ins. Co. of N.H., Inc. v. United States Fid. & Guar. Co.*, 143 F.3d 5, 7 (1st Cir. 1998).

## B. Choice of Law

The contract between Bankers Life and Mr. Knowlton has a choice of law

provision:

> This Contract shall be construed in accordance with the laws of the State of Illinois exclusive of choice of law provisions.

DSMF Attach. 1 Ex A-1 (*Branch Sales Manager Contract*) ¶ 25. Mr. Knowlton argues and Bankers Life agrees that Illinois substantive law controls his contractual claims. *Pl.'s Resp.* at 5–6; *Def.'s Reply* at 2 (stating that "both the Contract and controlling Illinois law refute Mr. Knowlton's argument"). Similarly, the parties agree that Maine law controls the tort claims. *Pl.'s Resp.* at 6; *Def.'s Reply* at 5–7 (analyzing tort claims under Maine law).

## C. Slander *Per Se* (Counts XV and XVIII)

In Count XV of his Amended Complaint, Mr. Knowlton says that on July 27, 2006, James Valdez told a person named Lucy Karl "Quite to the contrary, the investigation by the investigation by (sic) the Maine Bureau of Insurance led the Bureau to conclude that Mr. Knowlton was not competent to manage the Bangor office, nor remain in any management capacity in any Maine branch operated by Bankers Life and Casualty Company."[6] *Am. Compl.* ¶ 183. Mr. Knowlton alleges "[u]pon information and belief" that James Valdez has repeated that statement to other third parties. *Id.* ¶ 184.

---

[6] Paragraph 183 of the Amended Complaint reads:

> On June 27, 2006 James Valdez told Lucy Karl, Counsel "Quite to the contrary, the investigation by the investigation by the Maine Bureau of Insurance led the Bureau to conclude that Mr. Knowlton was not competent to manage the Bangor office, nor remain in any management capacity in any Maine branch operated by Bankers Life and Casualty Company.

The identity and significance of "Lucy Karl Counsel" is a mystery. She is not mentioned further in the parties' memoranda or in their statements of facts.

In Count XVIII of his Amended Complaint, Mr. Knowlton alleges that on July 7, 2006, Michael Buckley "told Gerald Glynn among other things, that the State of Maine had determined that Alan Knowlton could not be a Branch Sales Manager in Maine [or in any state] because of Alan Knowlton's improper/dishonest sales practices." *Id.* ¶¶ 212, 213. Mr. Knowlton alleges "[u]pon information and belief" that Michael Buckley has repeated that statement to other third parties. *Id.* ¶ 214.

On December 14, 2009, Bankers Life moved to dismiss Counts XV and XIII on statute of limitations grounds, *Bankers Life Defs.' Mot. to Dismiss*, and on April 27, 2010, applying Maine's two-year statute of limitations for slander claims, the Court granted the motion in part, specifically as to the July 2006 statements of both Mr. Valdez and Mr. Buckley, *Order on Mots. to Dismiss* at 9–12. However, the Court did not dismiss the counts in their entirely because the record was ambiguous as to when Mr. Valdez and Mr. Buckley repeated these statements. *Id.* at 11–12 (explaining that "[a]bsent evidence that they repeated these statements within two years of July 2, 2009, Mr. Valdez and Mr. Buckley will be entitled to a summary disposition of these counts").

Bankers Life's motion for summary judgment seeks to eliminate these claims altogether by challenging Mr. Knowlton's basis for contending that Mr. Valdez and Mr. Buckley repeated these statements since July 2, 2007, two years prior to the filing of his claim. *Defs.' Mot.* at 4–5. In his response, Mr. Knowlton contends that the statute of limitations does not run if the Defendant's conduct constitutes a continuing tort. *Pl.'s Resp.* at 19. He points out that the Bankers Life Consent

Agreement is "still being published today" and that it terminated Mr. Knowlton because his work represented an "unacceptable level of incompetence" and because he lacked "adherence to the legal requirements." *Id.* Claiming these statements were slanderous, Mr. Knowlton says that "the Bankers Life Defendants specific recitation of that slander subjects them to liability for the damages sustained by Mr. Knowlton. In other words, the slander is a continuing tort, negatively impacting Mr. Knowlton's ability to find employment." *Id.*

To the extent Mr. Knowlton continues to rely on his prior position that slander is a continuing tort, the Court rejected that position in its Order on the Motions to Dismiss and does so again for precisely the same reasons. To repeat, "[c]ourts almost universally decline to apply the doctrine [of continuing tort] in defamation cases." *Murphy v. Maine*, CV-06-62-B-W, 2006 U.S. Dist. LEXIS 61638, at *18 (D. Me. Aug. 29, 2006).

To withstand summary judgment on these Counts, Mr. Knowlton must raise a genuine issue of material fact as to whether either Mr. Valdez or Mr. Buckley repeated the allegedly slanderous statements after July 2, 2007. To that end, the Court has carefully reviewed the statements of material facts to determine whether they refer to any allegedly slanderous statements by either Defendant within the applicable period. The Court has found two references to slander in Bankers Life's statement of material facts:

> 51. The statements underlying Mr. Knowlton's claims against Messrs. Buckley and Valdez were all purportedly made before July 2, 2007.

DSMF ¶ 51. And:

52. Mr. Knowlton has no evidence that Buckley or Valdez made or repeated the slanderous statement alleged in the amended complaint after July 2, 2007.

DSMF ¶ 52. Mr. Knowlton posited the same response to both assertions:

> Qualified. The Consent Agreement between Bankers Life and the State of Maine which indicates that Mr. Knowlton is an incompetent and dishonest person continues to be published by the Defendants and the State of Maine. (Exhibit L, Knowlton Dep. at 208:23–209:5). Based on Mr. Knowlton's past experience with individuals terminated form (sic) Bankers Life, Mr. Knowlton believes that Messrs. Buckley and Valdez continued to repeat the statements that he was incompetent and dishonest to other (sic) after July 2007) (*Id.* at 216:3–22).

PRDSMF ¶¶ 51–52. In his Response, Mr. Knowlton did not refer to any evidence of slander in his separate statement of material facts, and the Court carefully reviewed his statement of additional material facts and found none.

The question, then, is whether Mr. Knowlton's qualified responses generate a genuine issue of material fact as to whether either Mr. Buckley or Mr. Valdez slandered him during the applicable statute of limitations period. To the extent Mr. Knowlton is relying on his past knowledge of how other individuals who were terminated at Bankers Life were treated, his belief that Messrs. Buckley and Valdez would have continued to repeat these statements would not be admissible evidence, and for the reasons earlier stated, the Court has declined to allow Mr. Knowlton to enter a qualified response that attempts to generate an issue of material fact based on forbidden speculation and character evidence. *See supra* Part I.D.3.z; FED. R. EVID. 401, 404(a), 608.

The question narrows to whether the continued publication of the Consent Agreement constitutes slander. If, as Mr. Knowlton claims, Bankers Life continued to publish the Consent Agreement, he has not put forth any evidence that either Mr. Valdez or Mr. Buckley was linked to the Bankers Life publication. His record support is limited to his own deposition:

> He [Mr. Valdez] would have - - in explaining what the company was doing with Alan Knowlton, he would have had to explain what this meant, plus it was - - it was included in the Maine's consent agreement that the company agreed to. So there's an untold number of people out there that can go to the Web site and read this and come to the conclusion that I'm an incompetent and dishonest person, which I am not, by the way.

PSAFM Attach. 15 208:23–209:5 (*Dep. of Alan Knowlton*). Mr. Knowlton's testimony does not raise a genuine issue of material fact that either Mr. Valdez or Mr. Buckley continued to slander him after July 2, 2007. Excluding the testimony relating to statements that Mr. Valdez "would have had to" have made—which the Court rejected as speculative—Knowlton refers only to postings on the Bankers Life website but fails to connect the posting to Messrs. Valdez or Buckley. *See Tropigas de Puerto Rico*, 637 F.3d at 56. This record evidence is insufficient to create a triable issue as to whether Mr. Valdez or Mr. Buckley made any slanderous statements about Mr. Knowlton after July 2, 2007. The Court concludes that Messrs. Valdez and Buckley are entitled to summary judgment on Counts XV and XVIII of the Amended Complaint.

### D.     Breach of Contract (Count XXI)

Relying on the contractual provision that "[e]ither party may terminate this Contract at will, without cause, by giving written notice to the other party,"

Bankers Life seeks summary judgment against Mr. Knowlton's contractual claim because in its view, the contract was terminable at will. *Defs.' Mot.* at 5–8. Mr. Knowlton counters that Illinois law presumes all contracts to be "at will" but allows a party to overcome this presumption by showing that the employer policies demonstrate an intent to agree to a definite term. *Pl.'s Resp.* at 9. Mr. Knowlton argues that the Bankers Life had policies and practices that create a genuine issue of material fact as to whether it had guaranteed him future employment subject to his meeting its performance goals and otherwise performing his duties faithfully and honestly. *Id.* at 8–13.

### 1.     Illinois Law

The seminal case for the duration of an employment contract in Illinois is *Duldulao v. St. Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 505 N.E.2d 314 (1987). In *Duldulao*, the Illinois Supreme Court observed that "an employment relationship without a fixed duration is terminable at will." *Id.* 115 Ill. 2d at 489, 505 N.E.2d at 317. The *Duldulao* Court described the general "employment-at-will rule" as "a rule of construction, mandating only a presumption that a hiring without a fixed term is at will, a presumption which can be overcome by demonstrating that the parties contracted otherwise." *Id.* 115 Ill. 2d at 489, 505 N.E.2d at 318. At the same time, the *Duldulao* Court went on to hold "that provisions in an employee handbook may give rise to a binding contract with at-will employees who accept the terms of the contract by commencing or continuing their employment with the employer." *Doyle v. Holy Cross Hosp.*, 186 Ill. 2d 104, 106, 708 N.E.2d 1140, 1142 (1999) (describing the *Duldulao* holding).

*Duldulao* remains good law in Illinois, but subsequent Illinois Supreme Court rulings have limited its reach. *See Dopkeen v. Whitaker*, 399 Ill. App.3d 682, 688, 926 N.E.2d 794, 800 (2010) (citing *Duldulao* as controlling law "under proper circumstances"). The *Dopkeen* Court explained that the Illinois Supreme Court limited its holding in *Duldulao* "by stating that only 'under proper circumstances' may an employee handbook be contractually binding" and it is "plaintiff's burden to explain why his case fell 'under proper circumstances' and [is] not controlled by the general rule." *Id.* (quoting *Untershuetz v. City of Chicago*, 346 Ill. App. 3d 65, 73, 803 N.E.2d 988, 995 (2004)). To satisfy this burden, the employee must demonstrate: 1) "the language of the policy statement . . . contain[s] a promise clear enough that an employee reasonably believe[s] that an offer has been made," 2) "the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer," and 3) "the employee must accept the offer by commencing or continuing to work after learning of the policy statement." *Duldulao*, 115 Ill. 2d at 490, 505 N.E.2d at 318; *accord Wood v. Wabash Cnty. Health Dep't.*, 309 Ill. App. 3d 725, 728, 722 N.E.2d 1176, 1179 (1999). Furthermore, in *Stoll v. United Way of Champaign County, Illinois, Inc.*, the Illinois Appellate Court noted an additional restriction in *Duldulao*: the employee handbook was created by the employer and the handbook expressly stated that it was "designed to clarify your rights and duties as employees." 378 Ill. App. 3d 1048, 1052–53, 883 N.E.2d 575, 579 (2008).

Significantly, however, as the Illinois Appellate Court observed, *Duldulao* addressed a situation where there was no written employment contract. *McWhorter v. Realty World-Star, Inc.*, 117 Ill. App. 3d 588, 593, 525 N.E.2d 1205, 1208 (1988) (explaining that *Duldulao* was distinguishable because "in *Duldulao* there was no express employment contract" while in *McWhorter* "an express employment contract was entered into between the parties"). Similarly, interpreting Illinois law, the Seventh Circuit observed in *Lashbrook v. Oerkfitz* that "unlike the plaintiffs in *Duldulao* and its progeny . . . , [the employee] had an express contract that governed his employment relationship with the Park District, and the instant case is distinguishable on that ground alone." 65 F.3d 1339, 1346 (7th Cir. 1995). Where there is an employment contract and an argument is being made that the contract incorporated another document, the rule in Illinois is that "the reference must show . . . an intention to incorporate the document and make it a part of the contract." *Arneson v. Bd. of Trs*, 210 Ill. App. 3d 844, 849–50, 569 N.E.2d 252, 256 (1991).

## 2.      Illinois Law and the Bankers Life Contract

Under Illinois law, the terms of the written employment contract between Mr. Knowlton and Bankers Life control. *Donnelly v. Chicago Park Dist.*, 417 F. Supp. 2d 992, 1002 (N.D. Ill. 2006) (applying Illinois law and stating that "an employee handbook or policy statement cannot override or modify the clear and unambiguous terms of an express employment contract"). Mr. Knowlton has made no showing that the employment contract in this case modified its employment-at-will clause by incorporating by reference any Bankers Life document or general

policies.[7]  This alone is sufficient to conclude that Mr. Knowlton cannot proceed against Bankers Life on his contract claim under *Duldulao*.

Even if *Duldulao* applied, Mr. Knowlton would still not prevail.  Under *Duldulao*, Bankers Life is entitled to the presumption that its employment agreement with Mr. Knowlton was terminable at will.  *See* 115 Ill. 2d at 489, 505 N.E.2d at 318.  The January 1, 1995 contract governing this lawsuit provides that "[e]ither party may terminate this Contract at will, without cause, by giving written notice to the other party."  DSMF ¶ 11; PRDSMF ¶ 11.  The contract further provides that it "supersedes and terminates all previous Contracts, any oral representations or understandings and constitutes the entire Contract between the parties."  DSMF ¶ 13; PRDSMF ¶ 13.  By its terms, the contract could only be "changed or modified by written consent signed on behalf of the Company."  DSMF ¶ 14; PRDSMF ¶ 14.

The question, then, is whether Mr. Knowlton has created a genuine issue of material fact to sustain his contention that Bankers Life incorporated its policies and practices into Mr. Knowlton's employment agreement by stipulating in the agreement that the "Manager agrees to abide by all policies, practices and procedures adopted by the Company."  *Branch Sales Manager Contract* ¶ 5(b).  Mr. Knowlton asserts that he has met the three Illinois prerequisites for application of

---

[7] The Court rejects Mr. Knowlton's contention that the "discharge for cause" provision transforms the employment contract into one that provides him employment until retirement.  *Pl.'s Resp.* at 13.  The contract provides that either party may terminate without cause by giving written notice and that Bankers Life may terminate for cause, in which case "no further compensation of any kind will be payable."  *Branch Sales Manager Contract* ¶ 20(a), (d).  Nothing in the employment contract justifies the conclusion that this termination for cause provision accords Mr. Knowlton a guarantee of employment until he retires so long as he is not terminated for cause.

the *Duldulao* Court's exception to employment at will: 1) the language of the policy contains a promise clear enough that an employee reasonably believes that an offer has been made, 2) the policy statement was disseminated to the employee so that he was aware of the promise and believed it to be an offer, and 3) Mr. Knowlton continued to work after learning of the policy statement. *Pl.'s Resp.* at 9–11 (citing *Wood*, 309 Ill. App. at 728, 722 N.E.2d at 1179).

The Court disagrees. First, by its precise terms, the employment contract does not create an obligation on the part of Bankers Life; it requires the "Manager," namely Mr. Knowlton, not the Company, to "abide by all policies, practices and procedures." It is difficult to conclude that Mr. Knowlton could have reasonably interpreted this language to impose a corresponding enforceable obligation on Bankers Life. However, to the extent Mr. Knowlton could have gathered from this language that Bankers Life was similarly bound by its policies and procedures, the employment contract expressly states that "[e]ither party may terminate this Contract at will, without cause, by giving written notice to the other party." DSMF ¶ 11; PRDSMF ¶ 11. Reading the contract as whole, the Court cannot conclude that Paragraph 5(b) of the Branch Sales Manger Contract "contains a promise clear enough that an employee reasonably believes that an offer has been made." *Duldulao*, 115 Ill. 2d at 490, 505 N.E.2d at 318.

Second, the *Duldulao* Court was discussing an employee handbook, which it concluded created legal obligations on the employer before discharging an employee. *Id.* at 490–91, 505 N.E.2d at 318–19. Here, Mr. Knowlton initially points to verbal

statements made by his supervisors over the years that he interpreted as promising employment until retirement: "It's your office"; "It's an opportunity to build your own business"; "The Branch Sales Manager is an entrepreneurial opportunity for you"; "Take personal ownership of your office"; "Run your office as you see fit"; and "Spend your budget as you see fit, it's your office." PSAMF ¶ 63; DRPAMF ¶ 63. These are general words of encouragement, not the kind of employer promises about pre-termination disciplinary procedures contained in the written employee handbook in *Duldulao*.

Mr. Knowlton also points to testimony from Bankers Life Vice Presidents Kunselman and Jordan that Bankers Life had a policy of only terminating branch managers based on a lack of performance or proven wrongdoing. *Pl.'s Resp.* at 10–11. However, there is no evidence that Bankers Life reduced this general policy to a written promise to its branch managers, and the Court views this type of statement more as an aspirational goal than a binding amendment to the written employment contract. Mr. Knowlton's references to the Bankers Life benefit programs do not change this analysis. The Court views the Bankers Life benefit and compensation programs as garden variety employee benefit and compensation programs, many of which encourage seniority.

In sum, under Illinois law, Mr. Knowlton has not stated a contractual claim against Bankers Life. Under *McWhorter* and *Lashbrook*, the employment contract by its terms is terminable at will, without cause, and by written notice, and the contract does not expressly incorporate any Bankers Life policies or procedures

guaranteeing Mr. Knowlton employment until retirement. The Court concludes that *Duldulao* does not apply, but if it did, Mr. Knowlton has not produced evidence that generates a genuine issue of material fact as to whether the so-called promises of employment until retirement are binding on Bankers Life.

### E.    Breach of Implied Covenant of Good Faith and Fair Dealing (Count XXII)

Citing Illinois law, Bankers Life argues that there is no implied covenant of good faith and fair dealing in a contract that is terminable at will. *Def.'s Reply* at 5. By contrast, also citing Illinois law, Mr. Knowlton claims that every Illinois contract, including employment contracts, contains a covenant of good faith and fair dealing. *Pl.'s Resp.* at 13–14.

Mr. Knowlton is correct that in Illinois "[e]very contract implies good faith and fair dealing between the parties to it." *Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, 352 Ill. App. 3d 160, 163, 815 N.E.2d 911, 914 (2004) (quoting *Martindell v. Lake Shore Nat'l Bank*, 15 Ill. 2d 272, 286, 154 N.E.2d 683, 690 (1958)). "The duty of good faith and fair dealing, however, is used only as a construction aid to determine the intent of the contracting parties." *Bank of Am., N.A. v. Shelbourne Dev. Group, Inc.*, No. 09 C 4963, 2011 U.S. Dist. LEXIS 21258, at *10 (N.D. Ill. Mar. 3, 2011). In other words, the duty of good faith and fair dealing "is only an aid to interpretation, not a source of contractual duties or liability under Illinois law." *Zeidler v. A & W Rests., Inc.*, 301 F.3d 572, 575 (7th Cir. 2002).

In Illinois, the "parties to a contract are entitled to enforce the terms to the letter and an implied contract of good faith cannot overrule or modify the express

terms of a contract." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003). Specifically, as applied to employment contracts, in *Mid-West*, the Illinois Appellate Court wrote:

> The duty of good faith and fair dealing does not override the clear right to terminate at will, since no obligation can be implied which would be inconsistent with and destructive of the unfettered right to terminate at will.

352 Ill. App. 3d at 163, 815 N.E.2d at 914 (quoting *Jespersen v. Minnesota Mining & Mfg. Co.*, 288 Ill. App. 3d 889, 895, 681 N.E.2d 67, 71 (1997)).

Under Illinois law, therefore, because the employment contract is terminable at will, Mr. Knowlton cannot maintain a separate cause of action for Bankers Life's breach of duty of good faith and fair dealing.

### F.  Promissory Estoppel (Count XXIII)

According to Maine law on promissory estoppel, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Martin v. Scott Paper Co.*, 511 A.2d 1048, 1050 (Me. 1986) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90 (2010)). Mr. Knowlton contends there is sufficient evidence in this record that Bankers Life executives:

> promised Mr. Knowlton that it had fought for his job; that the Maine Bureau of Insurance had demanded his termination; that Bankers [Life] knew that Mr. Knowlton was not at fault for the Consent Agreement and Bankers [Life] would take care of him; that it was Company practice to keep a Branch Manager until retirement as long as he met his performance goals and did not engage in substantial wrongdoing; that Bankers [Life] was going to make Mr. Knowlton the Branch Manager of a Massachusetts North [S]hore office; and that the

State of Maine had said Mr. Knowlton could not be a Branch Manager anywhere else.

*Pl.'s Resp.* at 14–15. He argues that there is "ample evidence" to create a material fact "as to whether Mr. Knowlton relied on those representations to his detriment." *Id.* at 15. Bankers Life disagrees. It says that promissory estoppel is not available when the plaintiff is an at will employee. *Def.'s Mot.* at 9–10; *Def.'s Reply* at 5. Furthermore, it contends that Mr. Knowlton's promissory estoppel theory is barred by the statute of frauds. *Def.'s Mot.* at 9–10; *Def.'s Reply* at 5.

In *Roy v. Runyon*, Magistrate Judge David Cohen deftly addressed relationship under Maine law between promissory estoppel and the statute of frauds in an employment context. 954 F. Supp. 368, 379–80 (D. Me. 1997). The *Roy* Court makes it clear that a plaintiff does not "automatically shed the [statute of frauds'] requirements by invoking promissory estoppel." *Id.* at 379. According to *Roy*, in *Stearns v. Emery-Waterhouse Co.*, 596 A.2d 72, 74 (Me. 1991), the Law Court declared that, as a matter of Maine law, "the doctrine of promissory estoppel would not be available to defeat the requirement of a signed writing in cases involving employment contracts requiring more than one year to perform." *Roy*, 954 F. Supp. at 379. The reason is "that it is too difficult to distinguish factually the reliance interests in a promissory estoppel claim from the ordinary preparations that attend any new employment." *Id.* (internal punctuation omitted). Applying the statute of frauds to the promissory estoppel claim in that case, Judge Cohen concluded that "absent the lack of signed writing, it is obviously true that as the contract at issue moves beneath the one-year threshold and approaches (or becomes) a promise of

employment at will, the reliance interest that would support a claim of promissory estoppel likewise approaches the vanishing point." *Id.* at 380.

Judge Cohen's analysis is echoed with a slightly different emphasis in *Lockrow v. Biddeford-Saco Country Club*, No. CV-01-320, 2002 Me. Super. LEXIS 116, at *1 (Me. Super. May 30, 2002). There, the Superior Court Justice observed:

> [A] claim for promissory estoppel, in the context of this employment dispute, is not compatible with Maine law. *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 155 (Me. 1991). If an employee, absent contractual provisions to the contrary, can be fired for non-discriminatory reasons at any time without just cause then it would be pointless to adopt the doctrine of promissory estoppel forcing the person to be hired only to be let go immediately thereafter.

*Id.* These cases are consistent with the proposition that in Maine, an at-will employee may not maintain a promissory estoppel claim. *See Bradley v. Kryvicky*, 574 F. Supp. 2d 210, 223 (D. Me. 2008) (concluding that "[p]romissory estoppel is unavailable in this case where an enforceable contract governs the same topic as the alleged oral promise"); *Popanz v. Peregine Corp.*, 710 A.2d 250, 251 (Me. 1998); *Hodgkins v. New England Tel. Co.*, 82 F.3d 1226, 1233 (1st Cir. 1996) ("An employee cannot avoid the statute of frauds 'based solely upon his detrimental reliance on an employer's oral promise of continued employment'" (quoting *Stearns*, 596 A.2d at 74)).

Mr. Knowlton has not stated a viable promissory estoppel claim under Maine law.

### G. The Section 1983 Claims (Counts I, III and VI)

To recover under 42 U.S.C. § 1983, "a plaintiff must prove that a deprivation of 'rights, privileges, or immunities secured by the Constitution and laws' of the

United States was carried out by persons acting under color of state law." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (quoting 42 U.S.C. § 1983). This standard breaks down into two overriding inquiries: "(1) whether the conduct complained of was committed by a person acting under the color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Gutierrez-Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

Turning to the first requirement—color of state law—Mr. Knowlton contends that Bankers Life conspired with state officials to deprive him of his employment, and in doing so, that Bankers Life cloaked itself with state authority, making it susceptible to a § 1983 claim. *Pl.'s Resp.* at 17–18. Mr. Knowlton correctly asserts that under First Circuit law, "private parties who conspire with immune officials may be sued under § 1983." *Slotnick v. Staviskey*, 560 F.2d 31, 32–33 (1st Cir. 1977); *accord Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno*, 547 F.2d 1, 3 (1st Cir. 1976) (concluding that the plaintiff stated a cause of action against a bank and corporation under § 1983). The First Circuit's conclusion in *Slotnick* was later upheld by the United States Supreme Court in *Dennis v. Sparks*, 449 U.S. 24, 29 (1980), and since then, the First Circuit has applied the rule. *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253–54 (1st Cir. 1996) (stating that "private actors may align themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp of § 1983"). Here, there is sufficient evidence in the record to raise a genuine issue of material fact as

to whether Bankers Life officials conspired with state of Maine officials to deprive Mr. Knowlton of his job with Bankers Life. Mr. Knowlton makes it over the first § 1983 hurdle.

He stumbles on the next. "[T]o state a cognizable claim for a violation of due process pursuant to 42 U.S.C. § 1983, a plaintiff must show a deprivation of a constitutionally protected property or liberty interest." *Krennerich v. Inhabitants of the Town of Bristol*, 943 F. Supp. 1345, 1352 (D. Me. 1996). Mr. Knowlton relies on the incorporation of Bankers Life's policies and practices into his written employment contract to establish his property interest in continued employment with Bankers Life. However, the Court has rejected this contention and has concluded that under Illinois law he was an at-will employee.[8] *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539 (1985) ("Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law" (internal punctuation omitted));*Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127, 134 (1st Cir. 2005) (explaining that "[t]o determine whether public employees possess such a property right [in continued public employment], we examine the local law and the terms and conditions of the employment arrangement"). As an at-will employee, Mr. Knowlton had no property interest in continued employment at Bankers Life and no property interest cognizable under § 1983. *Ayala-Rodriguez v.*

---

[8] The conclusion would be the same under Maine law. *See Mercier v. Town of Fairfield*, 628 A.2d 1053, 1055 n.3 (Me. 1993) ("A contract of employment for an indefinite period is terminable at the will of either party unless the parties have clearly stated their intention to restrict the common law rule").

*Rullan*, 511 F.3d 232, 238 (1st Cir. 2007) (affirming a district court's dismissal of a Plaintiff's § 1983 due process claim because "[a]n ordinary 'at will' employment contract creates no protectable expectation of continued employment, and [the Plaintiff's] termination of his annual contract is no different" (internal citation omitted); *Burrell v. Bd. of Trs. for the Univ. of Me. Sys.*, 15 Fed. Appx. 5, 6 (1st Cir. 2001) (concluding that the plaintiff's due process claim failed because "he failed to allege facts sufficient to show a property interest in his job"); *Krennerich*, 943 F. Supp. at 1352 (stating that an employee has no property interest in at-will employment). His § 1983 claims must, therefore, fail.

### H. Negligent Misrepresentation and Fraudulent Misrepresentation Claims (Counts XII, XIII, XIV, XVI, XVII, XIX, XX)

#### 1. The Parties' Positions

In his Amended Complaint, Mr. Knowlton alleges that Bankers Life and its supervisory employees either made misrepresentations or made negligent misrepresentations, that he justifiably relied on these misrepresentations, and that he suffered economic loss as a result. *Am. Compl.* Counts XII, XIII, XIV, XVI, XVII, XIX, XX. Specifically, he says that the Bankers Life Defendants told him that the Bureau of Insurance had concluded that he could not handle Bankers Life's current problems with improper sales practices, that the Bureau had insisted on his removal as the Branch Manager for the Bangor office, that Bankers Life had attempted to dissuade the Bureau from its position, that the Bankers Life Defendants assured him that they knew he was not at fault and would take care of

him, and that it had a great opportunity for him in Massachusetts. *Id.* He asserts that these representations were false. *Id.*

In its motion, Bankers Life says that the misrepresentation claims fail as a matter of law for the following reasons: 1) the statements about the Bureau were true—the Bureau had concluded Mr. Knowlton was incompetent and dishonest and had to be removed as Branch Manager; the Bureau had in fact required Bankers Life to remove Mr. Knowlton as Branch Manager; and Bankers Life did have a great opportunity for Mr. Knowlton in Massachusetts; 2) even if the Bureau's conclusions about Mr. Knowlton could be deemed untrue, the Bureau's statements about Mr. Knowlton were statements of opinion, which do not give rise to a misrepresentation claim; 3) the statements were immaterial; 4) Mr. Knowlton did not justifiably rely on the statements; 4) he cannot demonstrate proximate cause; 5) he did not suffer any damages as a consequence of the misrepresentations; 6) that the Bankers Life Defendants did not make these representations intentionally or negligently; and, 7) that Mr. Knowlton cannot recover damages for emotional distress from the misrepresentations. *Def.'s Mot.* at 11–19.

In response, Mr. Knowlton disputes whether the Bureau required Bankers Life to terminate Mr. Knowlton as Branch Manager, whether Bankers Life fought for him, and whether Bankers Life ever intended to make him the North Shore Branch Manager. *Pl.'s Resp.* at 16–17. Mr. Knowlton says that he relied on these representations to his detriment and refused an employment offer from Combined Insurance. *Id.* at 17. Finally, although Mr. Knowlton concedes that he cannot

recover emotional distress damages for the intentional misrepresentation claims, he contends that Maine law permits recovery for the negligent misrepresentation claims. *Id.* at 20.

In reply, Bankers Life reiterates its view that Maine limits recoverable damages to pecuniary loss for negligent misrepresentation claims. *Def.'s Reply* at 7.

###    2.    Fraudulent and Negligent Misrepresentation in Maine

Maine allows causes of action for both intentional[9] and negligent misrepresentation. *See* Jack H. Simmons, Donald N. Zillman & David D. Gregory, MAINE TORT LAW § 11.02–11.08 (2004 ed.) (MAINE TORT LAW).  To sustain a claim for fraudulent misrepresentation, the plaintiff must demonstrate by clear and convincing evidence: 1) that the defendant has made a false representation; 2) of a material fact; 3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it; and, 5) that he justifiably relied on the representation as true and acted upon it to his damage. *Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640, 654–55; *Me. Eye Care Assocs.* 2006 ME 15, ¶ 19, 890 A.2d at 711; MAINE TORT LAW § 11.03.

---

[9] In his complaint, Mr. Knowlton titles his non-negligent misrepresentation claims simply as "misrepresentation," and makes allegations of "false representations."  *Am. Compl.* Counts XIV, XVII, XX.  The same tort seems to go by several names.  The authors of MAINE TORT LAW refer to the tort variously as intentional misrepresentation, fraud, and deceit.  MAINE TORT LAW § 11.02–11.03. The Maine Supreme Judicial Court uses the term "fraudulent misrepresentation" and this Court follows suit.  *Me. Eye Care Assocs. P.A. v. Gorman*, 2006 ME 15, ¶ 16, 890 A.2d 707, 711.

The Maine tort of negligent misrepresentation[10] has the following elements: 1) the plaintiff was supplied false information by the defendant; 2) of a material fact; 3) the defendant did not exercise reasonable care or competence in communicating the information; and, 3) the plaintiff justifiably relied on that false information causing him economic harm. *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1996). Recovery is limited to matters in which the parties have a pecuniary interest and to persons the speaker intended to benefit by providing the information; damages are limited to out-of-pocket loss. *Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990); MAINE TORT LAW § 11.08. Furthermore, contributory negligence on the part of the recipient bars recovery. MAINE TORT LAW § 11.08. In *Rand v. Bath Iron Works*, 2003 ME 122, ¶ 13, 832 A.2d 771, 774, the Maine Supreme Judicial Court adopted the Restatement's description of negligent misrepresentation as being "more restricted than that for fraudulent misrepresentation." (quoting RESTATEMENT (SECOND) OF TORTS § 552(1) cmt. a (RESTATEMENT)).

### 3. The Plaintiff's Claims and the Law

In the Court's view, Mr. Knowlton has generated a sufficient record in this case to withstand summary judgment on the fraudulent and negligent misrepresentation claims against the Bankers Life Defendants. In effect, Mr. Knowlton charges that Bankers Life was engaged in a double game: assuring him that it was acting as his advocate before the Bureau while at the same time,

---

[10] Negligent misrepresentation is also known as unintentional misrepresentation. MAINE TORT LAW § 11.08; *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771, 774.

offering him up as a scapegoat to the Bureau in hope that the Bureau would be lenient with Bankers Life. The intended effect of this double dealing, from Mr. Knowlton's perspective, was to mollify him, retaining his good will, during a period of intense governmental scrutiny. Then, acting on the false assumption that he should return to Bankers Life because of the loyalty he thought it had shown him, Mr. Knowlton turned down a potentially lucrative position with another insurance company.

The Court acknowledges that Bankers Life emphatically rejects Mr. Knowlton's version of these events; however, for purposes of summary judgment, the Court is required to accept the non-movant's version of the facts to the extent they are supported by the record evidence. As the Maine Supreme Judicial Court wrote in *Rand*, in negligent misrepresentation cases, the inquiry as to whether the defendant committed the tort "is a question for the fact-finder." 2003 ME 122, ¶ 13, 832 A.2d at 774. The Court draws a similar conclusion on the fraudulent misrepresentation claim.

Mr. Knowlton generally survives summary judgment on Counts XII, XIII, XIV, XVI, XVII, XIX and XX. On one point, however, he does not. Mr. Knowlton has conceded that he is not entitled to emotional distress damages for an intentional misrepresentation claim. *Pl.'s Resp.* at 20. However, he contends that he is entitled to emotional distress damages for emotional distress arising from negligent misrepresentation. *Id.* He is wrong. The Maine Supreme Judicial Court has repeatedly emphasized that recovery under a negligent misrepresentation claim

is limited to pecuniary loss. For example, in *Rand*, the Maine Supreme Judicial Court recited the Restatement formulation for claims of negligent misrepresentation, which states that a defendant who supplies others false information "is subject to liability <u>for pecuniary loss</u> caused by their justifiable reliance on the information." *Rand*, 2003 ME 122, ¶ 13, 832 A.2d at 774 (quoting RESTATEMENT (SECOND) OF TORTS § 552(1)) (emphasis supplied); *see also Metayer v. PFL Life Ins. Co.*, No. 98-177-P-C, 1999 U.S. Dist. LEXIS 23432, at *26 (D. Me. Jul. 15, 1999) (limiting recovery to pecuniary loss); *Chapman*, 568 A.2d at 830 (same); *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987) (explaining that "fraud actions are essentially economic in nature and serve to protect economic interests"); MAINE TORT LAW § 11.08 (stating that damages for unintentional misrepresentation are limited to out-of-pocket loss).

## I.  Punitive Damages

Maine law on punitive damages is controlled by *Tuttle v. Raymond*, 494 A.2d 1353 (Me. 1985). In *Tuttle v. Raymond*, the Maine Supreme Judicial Court limited the availability of punitive damages to cases involving either "'express' or 'actual' malice" or "deliberate conduct by the defendant, [which,] although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied." *Id.* at 1361.

In its motion, Bankers Life argues that the punitive damages award cannot be sustained because "there is absolutely no evidence that the Bankers Life Defendants acted with malice." *Def.'s Mot.* at 19–20. In response, Mr. Knowlton

only says that whether Bankers Life's actions meet the *Tuttle v. Raymond* standard "is a factual question which is best left to the jury." *Pl.'s Resp.* at 20.

Based solely on the argument that Bankers Life has raised, the Court concludes that the punitive damages count survives summary judgment. If the Bankers Life Defendants engaged—as Mr. Knowlton claims—in a double game, appeasing the Bureau while mollifying him, then a jury could find that even though not motivated by actual malice, malice could be implied.

## III. CONCLUSION

The Court GRANTS in part and DENIES in part the Bankers Life Defendants' Motion for Summary Judgment (Docket # 59). The Court GRANTS summary judgment in favor of Bankers Life and Casualty Company, James Valdez, Michael Buckley, and Bruce Jordan on Counts I, III, VI, XV, XVIII, XXI, XXII and XXIII. The Court GRANTS in part summary judgment in favor of Bankers Life and Casualty, James Valdez, Michael Buckley, and Bruce Jordan and DENIES in part summary judgment against Alan Knowlton on Counts XII, XIII, XIV, XVI, XVII, XIX and XX; the Court GRANTS summary judgment on each Count only to the extent Alan Knowlton is claiming non-pecuniary damages; otherwise, the Court DENIES summary judgment on each Count. Finally, the Court DENIES summary judgment against Alan Knowlton on his punitive damages claim.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 13th day of June, 2011