UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| ALAN D. KNOWLTON, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09-cv-00334-MJK |
| | ) | |
| BANKERS LIFE AND CASUALTY | ) | |
| COMPANY, *et als*., | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY**

Plaintiff Alan Knowlton claims that he turned down an opportunity to be a territorial manager for Combined Insurance in Maine because he relied on misrepresentations made to him by Defendants about his future with Bankers Life, a company he had served for roughly 25 years. Knowlton relies on the testimony of two expert witnesses to support a contention that the present value of his economic loss is roughly $430,000. Bankers Life has filed a motion to exclude the testimony alleging that there is no reliable expert methodology at work and that the testimony is speculative. (Consolidated Daubert Mot., Doc. 107.) The motion is granted in part and otherwise deferred pending *voir dire*.

**Rule 702**

Pursuant to Rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 assigns to judges a "gatekeeper" role to ensure that expert testimony is not introduced at trial unless the Rule's requirements are satisfied. The First Circuit has described the requirements as follows: (1) that the witness have expertise based on knowledge, skill, experience, training, or education; (2) that the testimony concern scientific, technical, or other specialized knowledge; and (3) that the testimony be beneficial to the trier of fact in terms of helping to understand or determine a fact in question. Correa v. Cruisers, 298 F.3d 13, 24 (1st Cir. 2002).

A judge exercising the gatekeeper role must evaluate whether the challenged expert testimony is based on reliable scientific principles and methodologies in order to ensure that expert opinions are not "connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). The following non-exclusive factors aid in this task:

> (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline.

United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993)). In addition to these factors, the trial court may consider other factors that are probative of reliability in light of the particular facts and circumstances of the case at hand. Id. Ultimately, the proponent of the expert testimony must establish that it is reliable and relevant to a factual dispute. The proponent is not required to prove that the expert's opinion is correct. Id. at 63. "Once a trial judge determines the reliability of the expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to inferences and conclusions he draws from it and any flaws in his opinion may be exposed through cross-examination or competing expert testimony." Brown v. Wal-Mart Stores,

Inc., 402 F. Supp. 2d 303, 308 (D. Me. 2005). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

**The Challenged Opinions**

Mr. Knowlton's two experts are Lawrence D. Copp, a senior economist at Economic & Policy Resources, of Vermont, and John May, a certified rehabilitation counselor with Solutions Inc. Comprehensive Rehabilitation Services, of Vermont and New Hampshire. Knowlton seeks to demonstrate his lost earnings potential with Combined Insurance through the testimony of Mr. May and, with that in place, to utilize Mr. Copp to provide calculations concerning the present value of the same, as modified by various economic factors. Additionally, Knowlton has requested of Mr. May a vocational assessment of what his best alternative employment is, now that he has declined the opportunity with Combined Insurance. Mr. May has opined that the best "residual" employment for Knowlton is as an insurance sales agent /representative and he has offered a projection about likely income in such a job. In turn, Mr. Copp uses some of what Mr. May says to calculate the present value of this alternative employment, which he then offsets against his other calculation to provide a measure of economic loss.

A.  *Mr. May's Reports and Opinions*

In the wake of the Court's June 13, 2011, summary judgment disposition, Mr. May has offered an updated vocational assessment "regarding Alan Knowlton's vocational potential and earning capacities." (May's 2011 Report, Doc. 110-3, Ex. 3 at 1.) This updated assessment builds on a report prepared in 2007 that offered "an expert vocational opinion regarding Mr. Knowlton's vocational potential earning capacities." (May's 2007 Report, Doc. 110-2, Ex. 2 at 1.) The 2007 Report offered opinions "regarding the types of work Mr. Knowlton is currently

qualified to perform and his present earning capacity in today's Bangor, ME, labor market."
(Id.) In his 2011 Report, however, Mr. May notes that counsel for Knowlton "has requested an assessment of Mr. Knowlton's projected earning capacity in the position with Combined Insurance versus his earning capacity in his position as a Unit Sales Representative at Bankers Life." (May's 2011 Report at 2.) Consistent with this revised approach to damages, Knowlton states in his memorandum in opposition to the motion to exclude that Mr. May's report now offers "an assessment of what Mr. Knowlton would have earned in a management position at Combined Insurance versus his earning capacity as a unit sales representative at Bankers life." (Pl.'s Mem. in Opposition at 4, Doc. 109.) This point is reiterated in the December 29, 2011, May Affidavit introduced by Knowlton. (Doc. 110 ¶¶ 5-6, 14.)

According to Mr. May, the data, including information supplied by one John Morrison, a former regional manager for Combined Insurance, reveals that Knowlton would have been responsible for hiring and managing sales representatives and developing Combined Insurance's business in central and northern Maine, an area in which Combined Insurance had only "four or five" representatives working at the time. (In comparison, while managing Bankers Life's Bangor branch, Knowlton oversaw more than twenty representatives.) Mr. Morrison informed Mr. May that Knowlton's fixed salary, should he have accepted the position, would have been $20,000, with the potential being to earn "between $40,000 and $65-80,000," depending on sales volume. (May's 2011 Report at 2.)

Relying on data from the Maine Department of Labor, Mr. May offers that "first-line supervisors/managers" had a median income of $55,460, with experienced managers earning $68,290, and that the 2010 median salary for insurance sales agents in Maine was $41,680, with experienced agents earning $62,000. (Id. at 2-3.) Mr. May also notes that managers typically

4

make much of their income from commissions on branch or regional sales, based on a percentage of the gross sales of their agents. (Id.) Based on the fact that Knowlton would have been tasked with developing a new branch or region, Mr. May projected a five-year timeframe before Knowlton would be able to make earnings at the ninetieth percentile. (Id.) Mr. May relied, in part, on information supplied to him by one Bill Allen, a sales manager for National Life, who thought a three-to-five-year timeframe was reasonable. (Id.)

> Mr. May offers the following core opinion in his 2011 Report:
>
> Since Mr. Knowlton was no longer able to work as a Sales Manager at Bankers Life and since he had to forgo the opportunity at Combined, his earnings would likely approach the median for Insurance Sales Agents of $41,680 over the course of his remaining work life. Had he been able to return to work in the job as a Sales Manager at Combined, his earnings would likely have approached the top 10 percentile wage for workers in this occupation ($68,290) after he had the opportunity to build the branch in five years.

(Id.) In addition to these opinions found in the 2011 Report, Mr. May opined in his 2007 Report that Knowlton "is unable to return to work as a Branch Manager." (May's 2007 Report at 16.) According to Mr. May, this is so because companies promote managers from within based on demonstrated skill in making sales in the field. (Id. at 17.) Additionally, Mr. May indicated that, although Knowlton "clearly has transferrable skills to work for other employers in this field, the breach of contract [wrongful termination] has prevented him from accessing employment opportunities as a Branch Manager." (Id.) Reasoning that Knowlton would thus need to fall back on a position as an insurance sales agent, Mr. May observed that Knowlton would need to develop a book of business and opined that, "despite his experience as a Branch Manager," Knowlton "would likely begin at the lower end of the pay scale," which he characterized as the lowest 10 percent of workers in the field, with "earnings of $23,170 or less." (Id.) From there, according to Mr. May's 2007 Report, Knowlton would reach, within five years, a median income

5

of $42,290 (Maine data) or between $29,980 and $66,160 ("middle 50 percent" nationally). (Id. at 18.)

Mr. May's 2007 Report and his 2011 Report offer a study in contrast in one significant respect. In 2007, May opined that Knowlton's earning as a sales agent would continue to grow significantly until retirement age, reaching in excess of $70,000 annually. (Id.) In other words, May opined that Knowlton's book of business would continue to grow over time and that his earnings would not plateau at the median level. However, in his 2011 Report, May, without explanation, changed course and opined that Knowlton's income as a sales agent would only "approach the median" level "over the course of his remaining work life." (May's 2011 Report at 3.)

B. *Mr. Copp's Report*

Relying on Mr. May's projections, Mr. Copp offers a calculation of Knowlton's economic damages incurred "as a result of the incidents surrounding his termination of employment with Bankers Life." (Copp's 2011 Report at 1, Doc. 107-3.) The calculation, in present value, is "approximately $434,000." (Id.) After recounting Knowlton's employment history, including the offer from Combined Insurance and the "demotion and eventual termination" of employment with Bankers Life, Mr. Copp indicates:

> Based on these incidents and the vocational assessment performed by John May, this analysis estimates the loss of earnings to Mr. Knowlton had he accepted the position at Combined Insurance on January 23, 2006. . . . Mr. May has identified a without-incident earnings capacity for Mr. Knowlton at Combined Insurance consistent with that of a First-Line Supervisor of Non-Retail Sales Workers. Mr. May has opined the following in regards to Mr. Knowlton's earnings capacity at Combined: *"Had he been able to return to work in the job as a Sales Manager at Combined, his earnings would likely have approached the top 10 percentile wage for workers in this occupation ($68,290) after he had the opportunity to build the branch in five years.* According to Mr. May's analysis, as a result of the incidents culminating with the termination of Mr. Knowlton's pay on July 30, 2006, Mr. Knowlton is not expected to secure a replacement position as a Branch Sales

6

> Manager. In his vocational analysis, Mr. May finds that *"It would therefore not be expected that Mr. Knowlton could make* a *lateral move to another employer to work as* a *Branch Manager.*
>
> \*\*\*
>
> According to John May, given the incidents surrounding Mr. Knowlton's termination from Banker's Life, his earnings capacity is consistent with an entry level Insurance Sales Agent in Maine, corresponding to the 10th percentile wage level, or $26,390 in 2006 dollars. Mr. May opines that it will take five years of work experience in this position to reach the median wage level for this occupation.

(Id. at 2, 3 (footnotes omitted, emphasis in original).) Mr. Copp's calculations are best understood by reference to the tables he produced. Most of the underlying assumptions are drawn from Mr. May's projections, though there appears to be little correspondence in the numbers these two gentlemen use in their respective reports.

Mr. Copp relies on a number of economic "factors" that he, as an expert, can educate the jury about. One factor involves the use of a 3.23 percent annual increase for wages. Another involves fringe benefits measured as 10.6 percent of wages. Yet another involves the downward adjustment of earnings based on "the probabilities of [Knowlton's] labor force participation" in successive years. A forth factor involves adjusting for present value using a 2.56 percent discount rate. (Id. at 3 & Table 1.) Defendant does not challenge any of these various factors. Defendant only challenges Mr. Copp's opinion because it relies on earning projections offered by Mr. May.

As for the final numbers, Table 1 calculates total economic gain of $1,169,590, in present value, if Knowlton had taken the opportunity at Combined Insurance. Table 2 calculates total economic gain of $782,139, in present value, if Knowlton had fallen back on an insurance agent position in Maine. (Id. at 3 & Table 2.) According to Mr. Copp, Knowlton's economic damages are measured by the difference between these two scenarios ($387,451), adjusted upward by

7

$46,169 to compensate for the additional taxes Knowlton will have to pay for receiving his damages in a lump sum payment.

## Discussion

Defendant establishes that Mr. Copp's calculation of damages is dependent on Mr. May's opinions concerning likely income related to two hypotheticals, neither of which has come to pass: (1) that Knowlton would take the position with Combined Insurance and (2) that Knowlton would seek out and obtain a position as an insurance agent. Knowlton plainly relies on Mr. May to supply Mr. Copp with a means of maximizing Knowlton's likely income in his lost opportunity while also minimizing his projected earnings in his residual occupation, so called. Because there is no reliable method behind this attempt, Mr. May's opinions require the Court to perform its gatekeeper function.

A.     *Mr. May's Opinions*

Defendants object to the projections developed by Mr. May and argues that they are inconsistent and do not adequately explain why one projection places him so near the top of the income range within 5 years, despite significant uncertainties, while the other projection predicts he would fall at the 10 percent level to start and only reach median income after five years without ever rising above the median level.[1] Defendants argue that it is nothing more than an *ipse dixit* for Mr. May to propose these two divergent projections. Defendants say it is inexplicable why Mr. May would propose that Knowlton could readily transfer to a management position with Combined Insurance but, in the residual context, could not transfer to a manager

---

[1]     Again, in his 2007 Report, Mr. May indicated that Knowlton's income would likely increase by $5214 every year, including in years after he reached the average wage. (May's 2007 Report at 18.) However, in his 2011 Report, Mr. May states that Knowlton's income "would likely approach the median for Insurance Sales Agents of $41,680 over the course of his remaining work life." (May's 2011 Report at 3.)

8

position with any other insurance company. Defendants also argue that there is no underlying methodology to explain why one projection aims so high while the other aims so low.

In response, Mr. May explains that Knowlton more likely than not would be unable to secure another branch or regional manager position because of the negative impact of his removal from the branch manager position with Bankers Life and because of a tendency in the industry to promote managers from within. Knowlton also explains that his opportunity with Combined Insurance was an opportunity not likely to recur because the offer came from a professional acquaintance inside Combined Insurance who previously worked with Knowlton. This aspect of Mr. May's proposed testimony is not in itself excludable based on a Daubert challenge.

As for likely earnings, my view is that the challenges raised would ordinarily present issues of weight and would not bar the introduction of expert testimony designed to invite a reasonable calculation. However, I conclude that Mr. May's opinions that Knowlton would likely achieve the 90 percent level of earnings in his lost opportunity at Combined and less than the median in his residual lost opportunity as a sales agent at New York Life or elsewhere in Maine are not the product of an application of any expert methodology derived from Mr. May's education, training, or experience. Indeed, Mr. May has acknowledged that he has no experience in the area of predicting income levels. (May Dep. at 84-87.) There is simply no reliable methodology to explain why Mr. May's 2011 projection of agent-earnings never places Knowlton above the median income level whereas his projection of manager-earnings never places him below the median. The only explanation I can identify is the transparent one: he is attempting to maximize Knowlton's recovery. I simply cannot identify an expert methodology behind this approach to projecting earnings and am unwilling to allow the current presentation to

9

be made to the jury in the absence of a reasonable explanation based on a reliable expert methodology. For this reason, Mr. May is precluded from offering "expert" opinion testimony to the effect that Knowlton's likely placement in the range of earnings is the ninetieth percentile for one job and below the median for the other.

B.     *Mr. Copp's Opinions*

Defendants' challenge to Mr. Copp's calculation of economic damages is that it relies on flawed projections offered by Mr. May. The restrictions imposed on Mr. May's testimony have obvious implications for Mr. Copp's calculations. Knowlton has presented these experts as a package to provide the jury with a basis for calculating his economic loss and Defendants are entitled to know what will be introduced at trial, yet Knowlton needs to develop the testimony of these experts in a manner that will assist the jury rather than mislead or confuse it.

It is perfectly apparent to me that Mr. Copp has a lot of expertise to offer the jury with respect to how a proper economic analysis should be performed. However, I am not persuaded that it is reasonable to plug in Mr. May's predictions about one job likely providing well above median earnings and the other likely providing earnings exclusively at the median and below.[2] Consequently, Knowlton will have one final opportunity to prepare a reasonable calculation of economic loss through these witnesses, but he will have to do so without using Mr. May's

---

[2]     There is evidence that Knowlton rejected a job opportunity with New York Life that offered a *base* salary of $25,000, which appears to be more propitious than what Mr. May projected as starting income in his 2007 Report. Mr. May offers an explanation in paragraph 14 of his affidavit that he did not consider the New York Life offer because he was trying to project Knowlton's earnings "in his position at Banker's Life," but that just emphasizes another problem with his methodology: Mr. Knowlton's residual position at Bankers Life was as a unit manager in Boston and not as a sales agent or representative in Maine.

Proof of damages in this case is complicated by the fact that Knowlton is trying to prove the economic value of, in effect, two different opportunities that he has never pursued; one with Combined Insurance and one as an insurance sales agent. Proving lost opportunity damages is allowed under Maine law, but the evidentiary hurdles are significant and the Maine Law Court has held that there is a "need for careful attention to the quality of the evidence by the trial court." Snow v. Villacci, 2000 ME 127, ¶ 13, 754 A.2d 360, 364. Knowlton's current effort to calculate his loss is one that depends on unreliable and speculative expert testimony from Mr. May. Whether the combined expertise of Mr. May and Mr. Copp would permit them to produce a reliable enough calculation, if they put their minds to it, remains to be seen.

10

transparent projections designed to maximize damages in the absence of any expert methodology. Knowlton has already been provided with ample opportunity to supply the Court with a reliable expert methodology that would justify those particular projections and he has come up short. The opportunity for salvaging those particular projections no longer exists.

C.     *Mr. May's Supplemental Affidavit*

On January 5, 2011, Knowlton filed a motion (Doc. 130) for leave to present a supplemental declaration from Mr. May (Doc. 131). In his motion, Knowlton states that May's 2011 Report was produced on an expedited basis and that he would like Mr. May to be able to address the Court's "concerns regarding the comparator used by Mr. May in his expert analysis." (Mot. for Leave to Supplement at 1.) Defense counsel were contacted and indicated that they did not object to the Court's consideration of the document. The motion for leave has been granted and I have considered the supplemental affidavit.

In his supplemental affidavit, Mr. May explains why he chose insurance sales agent as the likely comparator. He bases the decision on a vocational analysis and I have been persuaded that the use of the insurance sales agent occupation is one reasonable approach that could ultimately be supported by the evidence at trial, depending on how it is developed. Defendants' challenges on that particular point go to weight, in my view. However, what remains unexplained is why projected income in this field is restricted to ten percent-to-median income and never more, while the Combined Insurance job is projected as median-to-ninety percent and never less. The supplemental affidavit does nothing to reinforce or explain that approach to calculating a likely measure of economic loss.

D.   *Supplemental Telephone Argument*

On January 5, 2012, after reviewing all of the foregoing issues, I conducted a telephone conference with the parties and instructed Knowlton that he will have to bring his experts to Court on Tuesday, January 10, 2012, for *voir dire* and that, unless they can present a reliable basis for computing a reasonable economic analysis that does not suffer from the identified problem of the existing approach, this team of experts will likely be excluded from testifying. I have afforded Knowlton another opportunity because I am reluctant to potentially take the legs out from under his case, but also recognize, in fairness to Defendants, that they are certainly entitled to know what the expert testimony will be before it is presented to the jury in open court.

## Conclusion

Defendants' Consolidated Daubert Motion is GRANTED, IN PART, and the existing economic loss calculation is excluded from evidence. Further resolution of the motion is deferred pending *voir dire*.

*So Ordered.*
January 6, 2012                               /s/ Margaret J. Kravchuk
                                              U.S. Magistrate Judge